

This opinion was filed for record

at 8:00 am on Jan 17, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Custody of L.M.S. | ) ) ) |
| | No. 92897-5 |
| FAUALUGA SIUFANUA and BILLIE SIUFANUA, | ) ) ) |
| Petitioners, | ) EN BANC ) |
| -v. | ) ) |
| TONY SAMOA FUGA and LISA LYNNETT SIUFANUA, | ) Filed    JAN 19 2017 ) ) |
| Respondents. | ) ) |

FAIRHURST, C.J.—Before a trial on the merits of a nonparental custody petition, the petitioner must satisfy a threshold requirement of "adequate cause" by showing that the biological parent is either unfit or that placing the child in the parent's custody would result in actual detriment to the child's growth and development. RCW 26.10.032(2). This standard protects biological parents' constitutional rights to raise their children. Here, Faualuga and Billie Siufanua (the grandparents) sought custody of L.M.S., their granddaughter. The grandparents contend that placing L.M.S. with Tony Fuga, her biological father, will cause actual detriment because the father has been mostly absent from her life and because they

are the only parents she has known. But absent additional circumstances, we cannot assume that interfering with the parent-like relationship between L.M.S. and her grandparents amounts to actual detriment. Fuga has a positive relationship with L.M.S., and he is able and willing to raise her. The grandparents failed to present sufficient facts demonstrating a specific detriment that would ensue if L.M.S. is placed with Fuga. Under these circumstances, the trial court correctly denied the grandparents' nonparental custody petition for lacking adequate cause. We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

L.M.S. was born to Fuga and Lisa Siufanua in December 2005. At the time, Fuga and Siufanua were living with Siufanua's parents, the grandparents. Sometime during the next three years, Fuga separated from Siufanua and moved to San Diego. Siufanua and L.M.S. remained with the grandparents. The grandparents claim that Fuga left Washington when L.M.S. was one year old. Fuga claims he left sometime in 2008, before L.M.S.'s third birthday.

In October 2008, Fuga married his current wife, Vaelua Fiatoa-Fuga, with whom he has two sons, ages five and six years old. Fiatoa-Fuga submitted an undisputed declaration attesting to the stable home life she and Fuga established for their two children.

Since moving to San Diego, Fuga has had minimal contact with L.M.S. In a December 2011 Facebook post to L.M.S., he wrote that "[it's] been 5 years since

2

[I've] seen you or heard your voice." Clerk's Papers (CP) at 39. Fuga claims he did not have an accurate address or phone number for L.M.S. Fuga also claims he sent Siufanua money, diapers, and other items to support her and L.M.S. Fuga's parents (L.M.S.'s paternal grandparents), who lived near Siufanua, would occasionally babysit L.M.S. on weekends and pay for some of L.M.S.'s expenses like school clothes. Fuga did see L.M.S. briefly when Siufanua brought her to San Diego for vacation in the summer of 2012. During the trip, L.M.S. met with Fuga and members of Fuga's family. Fuga and Siufanua exchanged contact information so they could communicate in the future. However, when Fuga tried calling the telephone number Siufanua provided, he discovered it was disconnected.

L.M.S. was essentially raised by her grandparents. Although Siufanua and L.M.S. may have lived in a separate apartment for a brief period, they have mostly resided at the grandparents' house since L.M.S. was born. Due to Siufanua's untreated drug addiction, the grandparents served as L.M.S.'s primary caretakers.

In a September 2012 order determining parentage, the King County Superior Court legally established Fuga as L.M.S.'s father, ordered him to pay child support, including back support, and gave custody of L.M.S. to Siufanua. The grandparents concede that Fuga has complied with the order.

In October 2014, Fuga learned that Siufanua had been incarcerated. He returned to Washington to obtain custody of L.M.S. On October 8, 2014, Fuga filed

a motion to modify the 2012 order determining parentage, asking the court to designate him as L.M.S.'s primary parent. On October 24, 2014, the grandparents filed a nonparental custody petition, seeking custody of L.M.S.

The grandparents argued they had adequate cause to seek custody for L.M.S., pointing to Fuga's absence during L.M.S.'s life and a domestic violence incident occurring before L.M.S. was born. In April 2005—eight months before L.M.S. was born—Fuga was arrested for assaulting Siufanua. Fuga was charged with fourth degree assault, but the case was dismissed after Fuga voluntarily entered and completed a domestic violence therapy program.

On November 14, 2014, a superior court commissioner issued an order concluding the grandparents failed to demonstrate adequate cause for a hearing on the merits, finding (1) no evidence that Fuga is unfit to parent, (2) that he is willing and able to take custody, and (3) that no actual harm would occur to the child in Fuga's custody. The trial court denied the grandparents' subsequent motion to revise the commissioner's order. The grandparents appealed, and the Court of Appeals, Division One, affirmed the trial court's order in an unpublished opinion. *In re Custody of L.M.S.*, No. 72938-1-I, slip op. at 1 (Wash. Ct. App. Feb. 8, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/729381.pdf. We granted the

grandparents' petition for review. *In re Custody of L.M.S.*, 185 Wn.2d 1033, 377 P.3d 742 (2016).

## II. ISSUE

Did the grandparents present facts that, if proved true, would establish that Fuga is either unfit or that placement with Fuga would cause actual detriment to L.M.S.'s growth and development?

## III. ANALYSIS

We have not definitively articulated what standard of review applies to consideration of a trial court's adequate cause determination on a nonparental custody petition. *See In re Custody of B.M.H.*, 179 Wn.2d 224, 239 n.1, 315 P.3d 470 (2013) ("we need not answer today whether a more deferential standard of review is appropriate for our review of a trial court's adequate cause determination on a nonparental custody petition"). Although the Court of Appeals in *B.M.H.* applied a de novo standard, which no party appealed, we typically apply a more deferential standard of review to adequate cause determinations in similar contexts. *Id.*; *see, e.g.*, *In re Parentage of Jannot*, 149 Wn.2d 123, 128, 65 P.3d 664 (2003); *see also In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993) ("[T]rial courts are given broad discretion in matters dealing with the welfare of children.").

Today, we articulate that we review a trial court's adequate cause determination on a nonparental custody petition for an abuse of discretion, like we do in other custody determinations. "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

*The grandparents failed to demonstrate adequate cause*

A person other than a parent may petition for custody of a child "if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." RCW 26.10.030(1). In 2003, the legislature amended the nonparental custody statute to require a threshold determination of "adequate cause" prior to a hearing on a third party nonparental custody petition:

> (1) A party seeking a custody order shall submit, along with his or her motion, an affidavit declaring that the child is not in the physical custody of one of its parents or that neither parent is a suitable custodian and setting forth facts supporting the requested order. The party seeking custody shall give notice, along with a copy of the affidavit, to other parties to the proceedings, who may file opposing affidavits.
>
> (2) The court shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits, in which case it shall set a date for hearing on an order to show cause why the requested order should not be granted.

RCW 26.10.032.

When the grandparents filed their nonparental custody petition, L.M.S. was not in the custody of either Fuga or Siufanua, thus satisfying the requirements in

6

RCW 26.10.030(1). The only issue is whether the trial court abused its discretion when it concluded the grandparents failed to establish adequate cause under RCW 26.10.032(2).

Adequate cause is a high burden. Courts have "long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment." *Troxel v. Granville*, 530 U.S. 57, 77, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (Souter, J., concurring). "[O]nly under 'extraordinary circumstances' does there exist a compelling state interest that justifies interference with . . . parental rights." *B.M.H.*, 179 Wn.2d at 235 (internal quotation marks omitted) (quoting *In re Custody of Shields*, 157 Wn.2d 126, 145, 136 P.3d 117 (2006)). "[C]onstitutionally protected parental rights may not be infringed merely because of a finding that someone could do a better parenting job." *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 346-47, 227 P.3d 1284 (2010). A mere showing that nonparental custody is in the best interests of the child is insufficient to establish adequate cause. *In re Custody of S.C.D.-L.*, 170 Wn.2d 513, 516-17, 243 P.3d 918 (2010). Likewise, a nonparent petitioner cannot establish adequate cause by presenting facts showing that the child is not in the parent's custody. *E.A.T.W.*, 168 Wn.2d at 345. Instead, "the requisite showing [of adequate cause] by the nonparent is substantial and a nonparent will be able to meet this substantial standard in only 'extraordinary circumstances.'" *B.M.H.*, 179

Wn.2d at 236 (internal quotation marks omitted) (quoting *Shields*, 157 Wn.2d at 145).

To demonstrate adequate cause, the nonparent petitioner must allege specific facts that, if proved true, would establish a prima facie case "that the parent is unfit or that placing the child with the parent would result in actual detriment to the child's growth and development." *E.A.T.W.*, 168 Wn.2d at 338.

A parent is unfit if he or she cannot meet a child's basic needs. *B.M.H.*, 179 Wn.2d at 236; *see also* RCW 26.44.010 (the state may intervene into the parent-child relationship in "instances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents . . . and in the instance where a child is deprived of his or her right to conditions of minimal nurture, health, and safety"). "Whether placement with a parent will result in actual detriment to a child's growth and development is a highly fact-specific inquiry, and '[p]recisely what might [constitute actual detriment to] outweigh parental rights must be determined on a case-by-case basis.'" *B.M.H.*, 179 Wn.2d at 236 (alterations in original) (internal quotation marks omitted) (quoting *Shields*, 157 Wn.2d at 143).

1.  *Granting Fuga custody of L.M.S. would not cause actual detriment to her growth and development*

The grandparents claim that due to Fuga's absence during L.M.S.'s childhood, he is essentially a stranger to her. They argue that placing L.M.S. in Fuga's custody would therefore cause actual detriment to her growth and development because it

would remove her from the only parents she has known. Though a child's psychological attachment to a nonparent may be a factor in considering a nonparent custody petition, the grandparents here failed to present sufficient facts demonstrating any specific detriment to L.M.S.'s growth and development that would ensue if Fuga gains custody.

The grandparents contend that their parent-like relationship with L.M.S. is sufficient to infer actual detriment. Washington courts have recognized that a child's psychological attachment to a nonparent may be a factor in considering whether placing the child with the parent will cause actual detriment. *In re Marriage of Allen*, 28 Wn. App. 637, 648, 626 P.2d 16 (1981); *In re Custody of Stell*, 56 Wn. App. 356, 369, 783 P.2d 615 (1989). In *Allen*, the child's stepmother sought custody after divorcing from the child's biological father. 28 Wn. App. at 640-41. In awarding custody to the stepmother, the court noted a relevant factor was the child's bond with her and her three children:

> Joshua had become integrated into the family unit formed by the marriage of Joe and Jeannie and his adoption of her three children. By the award of custody to Jeannie, the family unit remains essentially the same. Where the reason for deferring to parental rights—the goal of preserving families—would be ill-served by maintaining parental custody, as where a child is integrated into the nonparent's family, the de facto family relationship does not exist as to the natural parent and need not be supported. In such a case, custody might lie with a nonparent. As noted in *In re Aschauer*, [93 Wn.2d 689,] 697 n.5, [611 P.2d 1245 (1980)]:

"[I]t was formerly thought that blood ties between parent and child were extremely important. Now it is learned that kinship is not as important as stability of environment and care and attention to the child's needs. *See* J. Goldstien, A. Freud, A Solnit, *Beyond the Best Interests of the Child* (1973)."

*Id.* at 648 (fourth alteration in original) (footnote and citations omitted). Relying on *Allen*, the *Stell* court noted that expert testimony establishing that a child's aunt had become his psychological parent was a relevant consideration in the custody dispute with the biological father. *Stell*, 56 Wn. App. at 369.

But these cases do not demonstrate that a strong psychological connection, on its own, is sufficient to establish adequate cause. For one thing, *Allen* and *Stell* were decided before the legislature instituted the adequate cause threshold. More importantly, both *Allen* and *Stell* involve unique and extreme circumstances such that placement with the parent would have resulted in actual detriment.

For instance, in *Allen*, the child was deaf and the stepmother and her three children were fluent in sign language but the father was not. 28 Wn. App. at 641-42. Further, the court describes in great detail the stepmother's admirable efforts to accommodate the child's disability. *Id.* at 640-41 ("What makes this case exceptional is not only the fact that Joshua is deaf, but the dedication and effort Jeannie put forth to obtain assistance for him during the marriage."). The court further noted that the stepmother believed that "Joshua has unlimited potential and that he can reach any goal," while the father's attitude regarding raising a deaf child

10

was "apathetic and fatalistic." *Id.* at 642. The child's psychological integration into the stepmother's family was only possible specifically because they could all communicate with sign language: "We conclude that Joshua's disability and Jeannie's dedication demanded that he be placed with Jeannie. By placing the child with the stepmother, along with the other three children, the continuity of that family unit could be retained." *Id.* at 649.

In *Stell*, the child struggled with debilitating mental health issues due to a history of physical and sexual abuse. 56 Wn. App. at 360-62. The child's aunt provided a stable home environment and was actively engaged in his therapy and mental health treatment. *Id.* The aunt had demonstrated a commitment and an ability to address the child's needs that the father—who was only intermittently employed and had moved residences frequently—could not. *Id.* Although the court noted the importance of the child's psychological connection to his aunt, relying on *Allen*, it also concluded that unlike his father, the aunt could provide him with the stable environment he needed. *Id.* at 369.

We have suggested that absent these "extreme and unusual circumstances," a parent-like relationship with a child is insufficient to demonstrate adequate cause. *B.M.H.*, 179 Wn.2d at 239. In *Shields*, we expressed doubt regarding *Allen*'s discussion of the psychological attachment to nonparents:

> Although we approve the actual detriment standard articulated
> in *Allen*, we are concerned with references in that opinion to the

11

concept of a "de facto family." In *Allen* the court found that the nonparent, her children, and the child consisted of a "de facto family" and that in such a case, "custody *might* lie with a nonparent." *Allen*, 28 Wn. App. at 648 (emphasis added). As we recently stated in *L.B.*, incautious use of terms such as psychological parent, in loco parentis, and de facto parent has led to great confusion. [*In re Parentage of*] *L.B.*, 155 Wn.2d [679,] 691 n.7[, 122 P.3d 161 (2005)]. . . . Contrary to the suggestion in *Allen*, this court has not recognized "de facto family" as a legal status.

*Shields*, 157 Wn.2d at 145-46. Indeed, in *B.M.H.*, we concluded a nonparent failed to establish adequate cause despite evidence that he had become the child's psychological parent. 179 Wn.2d at 239. There, a stepfather filed a nonparental custody petition after he learned the mother planned to move with the child 50 miles away. *Id.* at 230. Because the child's biological father passed away before his birth, the stepfather had developed a strong parental relationship with the child. *Id.* The stepfather fulfilled traditional parenting duties until he divorced the mother when the child was approximately three years old, and he continued to be actively involved in the child's life after the divorce. *Id.*

The stepfather made the same argument that the grandparents present here—that the child viewed him as his father and that interfering with this relationship would cause actual detriment. The guardian ad litem assigned to the case submitted a report declaring that "B.M.H. viewed Mr. Holt as a father and that it would be detrimental for B.M.H. to terminate contact with Mr. Holt." *Id.* at 233. But despite

12

this evidence, we concluded that the stepfather failed to demonstrate adequate cause, specifically distinguishing the unique circumstances in *Allen* and *Stell*:

> [W]ithout more extraordinary facts bearing on B.M.H.'s welfare, the prerequisites for a nonparental custody action have not been met. The concern that Ms. Holt might interfere with Mr. Holt and B.M.H.'s relationship is insufficient to show actual detriment under *Shields* and to meet the burden of production for adequate cause under *E.A.T.W.* Although the importance of preserving fundamental psychological relationships and family units was part of the court's analysis in *Allen* and *Stell*, there were more extreme and unusual circumstances that contributed to the finding of actual detriment. In each case, the child had significant special needs that would not be met if the child were in the custody of the parent. Continuity of psychological relationships and family units was particularly important where a child had these special needs. Here, additional circumstances have not been alleged.

*B.M.H.*, 179 Wn.2d at 239 (footnote omitted). Our conclusion in *B.M.H.* controls here.

The grandparents argue that *B.M.H.* is distinguishable due to some notable differences in this case. For example, in *B.M.H.* the biological mother already had custody of the child, and he had lived with her more or less consistently throughout his life. Here, on the other hand, L.M.S. lived mainly wither her grandparents during her early years while Fuga was absent.

But these differences do not justify finding adequate cause here. The main evidence the grandparents rely on is their own declarations asserting that L.M.S. has lived with them for her entire life and that she calls them " mom'" and "'dad.'" CP at 28. Although L.M.S. undeniably has a strong bond with her grandparents, they

13

failed to present facts showing any specific detriment that would ensue if Fuga gains primary custody.

On the contrary, Fuga is a fit, capable parent willing to raise L.M.S. The record shows that Fuga and his wife are successfully raising two children in San Diego. Despite Fuga's early absence in L.M.S.'s life, the record shows he had reinitiated contact with her. L.M.S. had a positive visit with Fuga and his family in 2012, during which she "never once left [Fuga's] side" and called him "'[d]addy.'" CP at 235. L.M.S. recognizes Fuga as her father and has a positive relationship with him.

Under these circumstances, the grandparents failed to demonstrate what, specifically, about the nature of Fuga's custody would harm L.M.S.'s growth and development. Without more, we cannot assume that interfering with the strong relationship between L.M.S. and her grandparents would amount to actual detriment. Transitioning to Fuga's custody will undoubtedly be challenging because change is always hard. But nothing in the record here suggests this change amounts to the level of actual detriment contemplated by the adequate cause standard. We have repeatedly stated that a nonparent petitioner will be able to demonstrate adequate cause only in "'extraordinary circumstances.'" *B.M.H.*, 179 Wn.2d at 236 (internal quotation marks omitted) (quoting *Shields*, 157 Wn.2d at 145). The circumstances alleged by the grandparents are compelling, but they are not extraordinary. Indeed,

14

due to the nature of the proceeding, many nonparent petitioners seeking custody of a child will allege a parent-like relationship with the child. In *B.M.H.*, we held that a similar relationship was insufficient for adequate cause without additional circumstances. 179 Wn.2d at 239. Likewise, though we do not foreclose the possibility that interfering with such a relationship might result in actual detriment, the grandparents failed to present sufficient facts here. *Id.* at 236 (what causes actual detriment must be determined on a case-by-case basis).

We find the grandparents' other arguments unpersuasive. First, they argue that *B.M.H.* does not require demonstrating that the child has a special need that the parent is unable to accommodate. Evidence of a child's special needs can be a factor weighing in favor of a nonparent seeking custody of a child. *See id.* at 239 ("Continuity of psychological relationships and family units was particularly important where a child had these special needs. Here, additional circumstances have not been alleged."); *see also Allen*, 28 Wn. App. at 640-41 (father was unable to communicate with deaf child); *Stell*, 56 Wn. App. at 783 (child abuse victim required extensive therapy and stability that parent could not provide); *In re Custody of R.R.B.*, 108 Wn. App. 602, 31 P.3d 1212 (2001) (suicidal child required extensive therapy and stability that parent could not provide). But the grandparents are correct that *B.M.H.* did not establish a bright-line rule requiring evidence of a child's special needs to prove adequate cause. However, this does not mean they established

adequate cause. Adequate cause requires actual detriment, which the grandparents failed to prove.

Next, the grandparents argue that they need not prove their allegations, but instead need only present facts that, "if proved true," would show actual detriment. *B.M.H.*, 179 Wn.2d at 236. But courts need not take every allegation at face value. Nonparent petitioners seeking custody of a child still must satisfy a burden of production to show adequate cause. *Id.* The grandparents have not met their burden here.

### 2. *Fuga's alleged prior abandonment does not render him unfit*

The grandparents also allege that Fuga is an unfit parent because he abandoned L.M.S. *See id.* at 235 (adequate cause requires a showing that parental custody would cause actual detriment to the child *or* that the parent is "unfit"). They rely on two statutes. First, RCW 13.34.030(1) defines "abandoned" as "when the child's parent . . . has expressed, either by statement or conduct, an intent to forego, for an extended period, parental rights or responsibilities despite an ability to exercise such rights or responsibilities." Second, RCW 26.10.160(2)(a) provides that "[v]isitation with the child shall be limited if it is found that the parent seeking visitation has engaged in . . . (i) [w]illful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions."

16

Although Fuga's absence during L.M.S.'s early years is troubling, we are skeptical that it rises to abandonment. Fuga claims he maintained occasional contact with L.M.S. and Siufanua after moving to San Diego. He also claims he provided money, diapers, and other items for L.M.S. Fuga's parents also had a relationship with L.M.S. Fuga alleges he lost contact with L.M.S. and Siufanua when she moved without leaving a forwarding address. Neither Fuga nor his parents could locate them despite their efforts. The record suggests that the grandparents played a role in discouraging Fuga's efforts to contact L.M.S., particularly when he returned to Washington seeking custody. Of course, the grandparents dispute most of Fuga's claims. In any event, the record does not indisputably demonstrate that Fuga's absence constitutes legal abandonment.

But even if we assume, without deciding, that Fuga's prior conduct constitutes abandonment under the statutory provisions the grandparents cite, they provide no authority supporting their argument that *past* abandonment justifies a conclusion of *current* unfitness. They rely on *In re Interest of Mahaney*, 146 Wn.2d 878, 894, 51 P.3d 776 (2002), where the court stated that "[e]ven where there is no showing of present parental unfitness, in determining the best interests of the child the court may take into consideration emotional and psychological damage from prior unfitness of a parent and the child's current special needs for treatment and care."

17

But *Mahaney* is inapposite. The children in that case suffered from mental and behavioral illnesses that resulted from their parents' past behavior, including domestic violence, substance abuse, and allegations of sexual abuse. *Id.* at 884-85. The parents' prior abuse and the children's resulting disorders were documented by experts. *Id.* Here, the grandparents have failed to present facts demonstrating that Fuga's alleged prior abandonment similarly affected L.M.S. They also do not explain how Fuga's prior abandonment threatens L.M.S. currently or in the future. This is unlike *Mahaney*, where the parents' unfitness manifested in directly harmful and dangerous behavior.

The record unambiguously shows that Fuga is able and willing to parent L.M.S. He has complied with a child support order since 2012. He traveled from California in 2014 specifically because he learned L.M.S.'s mother had been incarcerated and was unable to parent L.M.S. In fact, the grandparents did not file a nonparental custody petition until nearly three weeks after Fuga asserted his custody rights. The grandparents' claim that Fuga's prior abandonment makes him currently unfit is factually unsupported and legally insufficient to show adequate cause.

We also note that the grandparents do not allege in their petition for review that Fuga is unfit due to a propensity for domestic violence. Though they made this argument at the Court of Appeals, it appears they may have abandoned it here. In

any event, Fuga's alleged history of domestic violence does not support a conclusion that he is currently an unfit parent. The record shows one incident of domestic violence that occurred over 10 years ago, 8 months before L.M.S. was born. This incident is too remote in time to support a conclusion of unfitness, particularly when the record shows Fuga is successfully raising two other children. The grandparents' other vague references to incidents involving Fuga are unsupported by the record. At best, the record shows that Fuga and the grandparents got into an argument when he arrived at their house, looking for L.M.S. There is no other evidence of domestic violence incidents involving Fuga.

Finally, the grandparents note that the trial court declined to appoint a guardian ad litem. The trial court certainly had the discretion to do so, but it was not required here. The primary purpose of the adequate cause threshold is to prevent a prolonged investigatory process that is an "unnecessary disruption and an evil to be avoided." *E.A.T.W.*, 168 Wn.2d at 348. If a petitioner fails to provide sufficient facts to prove adequate cause, the court need not unnecessarily extend the proceedings by appointing a guardian ad litem.

## IV. CONCLUSION

This case presents difficult circumstances. Fuga's absence from L.M.S.'s life is unfortunate, and the grandparents clearly have a close bond with L.M.S. But Fuga is capable and willing to raise her. The grandparents have failed to present sufficient

19

facts demonstrating that Fuga is unfit or that placement with Fuga would cause actual detriment to L.M.S.'s growth and development. We therefore hold the trial court did not abuse its discretion when it denied the grandparents' nonparental custody petition for lack of adequate cause.

_____
Fairhurst, C.J.

WE CONCUR:

_____
Wiggins, J.

_____
Johnson, J.

_____
Owens, J.

_____
Stephens, J.

_____

_____

No. 92897-5

YU, J. (dissenting)—This case centers around a single, simple question: Did

the grandparents of L.M.S., Faualuga and Billie Siufanua, produce a sufficient

factual basis to warrant a full evidentiary hearing on whether they should be

awarded custody of their granddaughter? Such evidentiary hearings are closely

guarded by the adequate cause requirement of RCW 26.10.032, which protects

families from "useless" hearings where nonparental petitioners cannot prevail on

the merits. *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 348, 227 P.3d 1284 (2010).

In my view, this case presents the sort of extraordinary circumstances to believe

that awarding custody to the biological parent, Tony Fuga, would result in actual

harm to L.M.S.'s growth and development. For these reasons, I respectfully

dissent.

Under chapter 26.10 RCW, a nonparental third party may petition for child

custody where sufficient facts exist that, if proved true, would show either that the

biological parent is unfit *or* that custody with the parent would result in "'actual

detriment to the child's growth and development.'" *In re Custody of B.M.H.*, 179

Wn.2d 224, 235, 315 P.3d 470 (2013) (quoting *E.A.T.W.*, 168 Wn.2d at 338).

Should a petitioner meet this prima facie burden, the court must schedule a hearing

to show cause why the requested order should not be granted. RCW 26.10.032(2)

("The court shall deny the motion unless it finds that adequate cause for hearing

the motion is established *by the affidavits*, in which case it *shall* set a date for

hearing on an order to show cause why the requested order should not be granted."

(emphasis added)). In this way, the court serves first as a gatekeeper, requiring

petitioners to meet the burden threshold by affidavit "before the courthouse doors

will open." *E.A.T.W.*, 168 Wn.2d at 346.

The trial court in this case denied the Siufanuas a show cause hearing on

whether custody of L.M.S. should be awarded in their favor. In refusing to grant a

hearing, the trial court impermissibly engaged in weighing facts when it found that

"[t]he child has a relationship with the father and thinks of the father as her father."

Clerk's Papers (CP) at 61. This finding oversteps the court's role as an initial

gatekeeper. The Siufanuas had not been given an opportunity to present evidence

beyond their initial declaration. *Id.* at 26-29. Chapter 26.10 RCW required that

the trial court assume the truth of the alleged facts—not weigh them against Fuga's

competing version. *E.A.T.W.*, 168 Wn.2d at 338.

The threshold determination to be made by the court was simply whether the

Siufanuas had met a prima facie burden under the statute. *Id.* Even in

2

supplemental briefing, Fuga mistakenly challenges the accuracy of the Siufanuas'

facts rather than the legal sufficiency for purposes of chapter 26.10 RCW. *See*

Suppl. Br. of Resp't at 17 ("The trial court specifically found that LMS has a

relationship with [Fuga], knows him as her father, and recognizes him as such.").

The majority perpetuates this error by highlighting the numerous differences in

Fuga's recitation of facts. *See* majority at 2, 3.

Further, the majority improperly relies on Fuga's recitation as evidence that

the Siufanuas did not meet their burden. *Id.* at 14 ("Despite Fuga's early absence

in L.M.S.' life, the record shows he had reinitiated contact with her. L.M.S. had a

positive visit with Fuga and his family in 2012, during which she 'never once left

[Fuga's] side' and called him "'[d]addy.'" L.M.S. recognizes Fuga as her father

and has a positive relationship with him." (citation omitted) (quoting CP at 235)),

16-17 ("Fuga claims he maintained occasional contact with L.M.S. and Siufanua

after moving to San Diego. He also claims he provided money, diapers, and other

items for L.M.S."); ("In any event, the record does not indisputably demonstrate

that Fuga's absence constitutes legal abandonment."). But RCW 26.10.032 does

not call on the trial court to engage in fact-finding at this stage, and our

jurisprudence requires only that the Siufanuas provide sufficient facts that would

support adequate cause if proved true. *E.A.T.W.*, 168 Wn.2d at 342-43 (citing

*Greico v. Wilson*, 144 Wn. App. 865, 875, 184 P.3d 668 (2008)). In truth, Fuga's

3

recitation of facts is completely irrelevant to the question before the trial court at that time and to the question before us now.

The Court of Appeals compounded the trial court's error in a different way. In affirming, the court noted that "[t]here is no allegation that LMS has a special need . . . Nor is there evidence in the record that Fuga is currently unable to meet LMS's needs." *In re Custody of L.M.S.*, No. 72938-1-I, slip op. at 6 (Wash. Ct. App. Feb. 8, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/729381.pdf. Although a similar argument regarding a parent-like relationship was raised in *B.M.H.*, this statement by the court reveals a misunderstanding of both the standard for third party custody petitions as well as the determinative facts in *B.M.H.* Although we have found evidence of actual detriment where a nonparent enjoys a parent-like relationship and the child has a special need that the biological parent would be ill equipped to manage, we have never before drawn a bright-line rule that a special need is a requisite to proving actual detriment. The majority's holding today brings us closer to such an implicit rule. Majority at 11 ("We have suggested that absent these 'extreme and unusual circumstances,' a parent-like relationship with a child is insufficient to demonstrate adequate cause.").

Further, the Court of Appeals misunderstood the operative facts underlying our holding in *B.M.H.* In that case, a stepfather who had raised B.M.H. since birth alongside his wife, the biological mother, petitioned for custody after the mother

4

threatened to move the child out of the area. *B.M.H.*, 179 Wn.2d at 230. The trial court, following the recommendations of an assigned guardian ad litem, found that adequate cause existed to proceed to a show cause hearing. *Id.* at 233. We reversed on discretionary review, noting that while "the importance of preserving fundamental psychological relationships and family units was part of the court's analysis" in prior cases, those cases also included "more extreme and unusual circumstances" such as a child's special needs. *Id.* at 239. Importantly, the emphasis of our review was on the importance of preserving the stepfather's relationship with the child in a case where the biological parent already had custody and had been raising the child since birth. *Id.* at 238. We held that the stepfather's allegations, if proved, "would not meet the high burden of showing that [the mother] is unfit or that her *continued custody* of B.M.H. would result in actual detriment to his growth and development." *Id.* at 234 (emphasis added).

Unlike *B.M.H.*, the crux of this case is not "moving a child away from a nonparent to whom the child is bonded." *L.M.S.*, No. 72938-1-I, slip op. at 6. Rather, this case is about moving a child *to* a parent with whom the child is allegedly not bonded in any way and to a parent who did not claim to be her father or pay child support until ordered to do so by the court. Accordingly, the facts of this case may be distinguished from *B.M.H.* in that the focus is not on the harm of breaking L.M.S.'s bond with the Siufanuas but in the harm of handing her to a

5

complete stranger. *See* CP at 5 ("The father is a stranger to this child as he abandoned her when she was one (1) . . . [and] has shown no interest in her academics or extracurricular activities, or any aspect of her life.").

We have stated that the actual detriment standard, when properly applied, results in the nonparent meeting this substantial burden only in "'extraordinary circumstances.'" *In re Custody of Shields*, 157 Wn.2d 126, 145, 136 P.3d 117 (2006) (quoting *In re Marriage of Allen*, 28 Wn. App. 637, 649, 626 P.2d 16 (1981)). The Siufanuas claim that "[t]his child has no memory of this father" who is "a stranger coming to take her away." CP at 28. In fact, the Siufanuas successfully obtained a restraining order on behalf of themselves and L.M.S. *against* Fuga just two weeks after Fuga petitioned for custody. *Id.* at 8-10. These are certainly extraordinary circumstances. If the Siufanuas' claims are proved true, it means more than simply the loss of the only parental figures this young girl has ever known; it also means that L.M.S. must now be raised by a father she allegedly does not know and has no attachment to. It means the loss of childhood friends and classmates, the loss of stability, the loss of familiarity and comfort with her home and her surroundings, and loss of contact with her mother, whose parental rights have not been terminated. It means being treated as a commodity to be shipped off to a different state to live with a man who, while certainly fit to parent, nonetheless made the decision to abandon his child in her infancy and expressed

6

only minimal desire to be a part of her life up until this point if the Siufanuas' allegations are proved true. *L.M.S.*, No. 72938-1-I, slip op. at 2.

I agree with the majority that the allegation of Fuga's prior domestic assault and abandonment, if proved true, does not meet the burden to show that Fuga is unfit. And, it may be that at a show cause hearing, the court would determine that Fuga's version of the facts are correct and that no actual detriment would occur to L.M.S.'s growth and development. Nonetheless, the Siufanuas have presented facts that, if proved true, show Fuga to be a complete stranger who arrived to take this young child away without warning, even appearing a second time with a police officer in tow who later commanded Fuga to leave. CP at 6. These unique allegations by the Siufanuas present adequate cause to believe that a change in custody might result in actual detriment to the growth or development of this young girl. "Just as parents' constitutional rights are long established, it is also true that children have rights regarding their well-being that are important factors properly guiding courts' custody decisions. Recognition of these rights is not offensive to the constitution." *E.A.T.W.*, 168 Wn.2d at 346 (footnote omitted); *see In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). It is thus no great stretch of the imagination to believe that "[t]his child will be emotionally and mentally harmed with the father taking her away from everything and everyone she knows . . . ." CP at 28.

7

The Siufanuas—and, indeed, L.M.S. herself—deserve an opportunity to scratch beneath the surface and demonstrate the actual harm inherent to removing a child from the only home she has ever known and placing her with an absentee father in a different state. They may fail to provide sufficient evidence at a show cause hearing, but such a hearing would certainly not be "useless" under these facts. *E.A.T.W.*, 168 Wn.2d at 348 ("The primary purpose of this threshold requirement for adequate cause . . . is, among other things, to prevent a useless hearing." (citing *In re Marriage of Lemke*, 120 Wn. App. 536, 540, 85 P.3d 966 (2004)). The majority disagrees, holding that no harm could result to a nine-year-old girl's growth and development when she is taken away suddenly by a total stranger who happens to be a fit parent. For these reasons, I respectfully dissent.

_____
Yu, J.

George McCloud, Jr.

González, J.

Madsen, J.

9