
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Visits with: | ) | |
| RV, MV, CV, MV, | ) | No. 36834-3-III |
| | ) | |
| KATHERINE NARAVANE, | ) | |
| YASHODHAN NARAVANE, | ) | |
| | ) | |
| Appellants, | ) | PUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL VINTHER, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — After nonparental visitation statutes were held unconstitutional in *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998) (striking down former RCW 26.10.160(3) (1996) and former RCW 26.09.240 (1989)), *aff'd on narrower grounds by Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) and *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005) (striking down former RCW 26.09.240 (1996)), a new nonparental visitation statute was adopted and became effective in 2018. LAWS OF 2018, ch. 183, §§ 1-9, codified at chapter 26.11 RCW.

Provisions of the statute evince a legislative intent that relative visitation over a parent's objection will be ordered only in compelling circumstances. And before a parent will be subjected to an evidentiary hearing, the petitioning relative must meet a uniquely

high threshold: it must satisfy the trial court that if its petition is heard, the petitioner is "more likely than not" to prove by clear and convincing evidence that (1) the parent's reasons for denying visitation are rebutted by a showing of a likelihood of harm of a substantial risk of harm to the child if visitation is denied and (2) visitation is in the child's best interest. RCW 26.11.030(8); .040(1)-(3). We review the trial court's finding for abuse of discretion.

Katherine and Yashodhan Naravane's petition for visitation with their grandchildren was dismissed after the superior court conducted the required review and found they failed to establish that visitation would more likely than not be granted. They ask us to reverse the superior court and remand for a hearing or, at a minimum, construe chapter 26.11 RCW as requiring more detailed findings.

The trial court's finding was sufficient, and it could reasonably find that the Naravanes had not shown a likelihood of clearly and convincingly proving either of the required elements of a relative visitation claim. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Angela Vinther and Michael Vinther were married for 15 years and had four children, now ranging in age from 5 or 6 years old to 16 or 17 years old. In 2015, the family was living in Las Vegas, where Mr. Vinther was stationed as an active duty member of the Air Force. In July of that year, Angela (sometimes called Angel) left Mr. Vinther and moved with the children to Walla Walla, where her mother and stepfather—

2

the petitioners in this case—reside. Angela[1] became involved with another man and in November 2015 she and the children moved to Oregon to live with him.

In June 2016, Mr. Vinther filed for divorce in Oregon. In August 2016, Angela traveled to Walla Walla and left the children with her mother and stepfather. A couple of months later, in late October 2016, she committed suicide.

When Angela died, Mr. Vinther applied to be transferred to Fairchild Air Force Base in Spokane, where he has family. He did not immediately pick up the children. According to him, he left them with the Naravanes for a short time because he needed help while taking care of things after Angela's death, the children were enrolled in school, and his focus was on getting transferred to Washington.

Plans were made for Mr. Vinther to visit his children in Walla Walla in November 2016. Unbeknownst to him, the Naravanes had commenced an action seeking non-parental custody of his children. Before his visit, they obtained an ex parte restraining order preventing him from removing the children from their home. Although the Naravanes' petition in that proceeding is not a part of our record, they would have been required to allege that the children had no fit parent or that placing Mr. Vinther's children with him would result in actual detriment to the children. *See* RCW 26.10.100.

---

[1] Mr. Vinther remarried, so two Ms. Vinthers have a place in the factual background. For clarity, we refer to them by the first names, intending no disrespect.

During the November visit, the Naravanes evidently sought to obtain Mr. Vinther's agreement that the children could remain in the Naravane home, but he did not agree. They then had him served with their nonparental custody petition and restraining order. Mr. Vinther became angry and the Naravanes called law enforcement. Mr. Vinther describes being served with the nonparental custody paperwork in front of his children as a "humiliating nightmare." Clerk's Papers (CP) at 37.

While the nonparental custody action was pending, Mr. Vinther became engaged to Cheyenne Reynolds. He had known her growing up and began seeing her after he had been separated from Angela for a year and had filed for divorce. By the time the non-parental custody petition came on for hearing in December 2016, he had been transferred to Fairchild Air Force Base and he, Cheyenne, and her three children had moved in together.

The superior court conducted an adequate cause hearing in the nonparental custody matter on December 19, 2016. It found no adequate cause and dismissed the Naravanes' petition. Its decision observed that Mr. Vinther and Angela had experienced a stormy marriage made more difficult by alcoholism and mental health issues by both parents, including Mr. Vinther's military-service induced post-traumatic stress disorder. It cited declarations from Mr. Vinther's supervisor and treating psychologist indicating that Mr. Vinther had received treatment from mid-July 2015 through the end of August 2016 that had included psychotherapy and an alcohol and drug abuse prevention and

4

treatment program.  It quoted his psychologist's observation that Mr. Vinther

"demonstrated 'excellent insight and stability' with 'excellent coping skills and good-

consistent supports who are healthy and willing to assist him as needed.'"  CP at 46.  The

court concluded:

> In this case the children will need continued counseling, family support,
> and a stable home environment.  Mr. Vinther's personal issues have been or
> are being addressed, and social services and family support are available.
> The Court can find neither that Mr. Vinther is an unfit parent nor that
> placement of the children with him would result in their actual detriment.

CP at 49.  Arrangements were made for Mr. Vinther to pick up the children at a court-

ordered transfer location between Spokane and Walla Walla on Christmas Day 2016.

After the nonparental custody action, Mr. Vinther ignored communications from

the Naravanes and told them to stop contacting his children on social media.  The

Naravanes' own exhibits demonstrate that Mr. Vinther had been in frequent and amicable

e-mail communication with them in early November 2016, before learning they were

trying to obtain custody of his children.  He refused to respond to electronic mail from

them thereafter.  He refused to provide them with his address, but they discovered it and

appeared at the Vinther home uninvited on the morning of Christmas Eve 2017.  Mr.

Vinther told them to leave.

On November 19, 2018, the Naravanes filed this action, petitioning for visitation

with their grandchildren two weekends a month from Friday to Sunday, one full week

every summer, half of winter break, and phone contact on major holidays and the

children's birthdays.

Mr. Vinther moved for an order requiring the Naravanes to advance the legal

expenses needed to respond, something that RCW 26.11.050(1)(a) requires of relatives

petitioning for visitation "unless the court finds, considering the financial resources of all

parties, that it would be unjust to do so." Although the Naravanes' average adjusted

gross income for the prior three years was more than four times greater than the Vinthers'

adjusted gross income and the Naravanes had no dependents (the Vinthers apparently

have seven), the Naravanes still fought the request for advanced fees because Mr. Vinther

was being represented by a legal services provider.[2] The court ordered the Naravanes to

advance $5,000 in fees and $250 in costs.

Only one round of affidavits is contemplated by statute—an opening affidavit

from the petitioner and any opposing affidavit from the respondent; *see* RCW

26.11.030(5), (6)—but three rounds of declarations were filed in the action below.[3] Nine

declarations were filed by the Naravanes and four were filed by Mr. Vinther. The reason

---

[2] Given the time frame when financial information was filed, the parties had different income figures available. The Vinthers provided income information for tax years 2016-2018, while the Naravanes provided income information for tax years 2015-2017.

[3] This is the number of declarations on the merits; additional declarations were filed that addressed Mr. Vinther's request that the Naravanes advance attorney fees.

for so many declarations is because the parties so strongly disagree about their

relationships with the children.

After reviewing the Naravanes' petition and the declarations submitted by the

parties, the superior court found in May 2019 that the Naravanes had not shown the

required likelihood that their petition would be granted.  It dismissed the petition.  The

Naravanes appeal.

ANALYSIS

I.      INTRODUCTION

A.      *Overview of proceedings under chapter 26.11 RCW*

As a parent, Mr. Vinther has a "'fundamental right to autonomy in child-rearing

decisions'" and his "'liberty' interest is protected as a matter of substantive due process

under the Fourteenth Amendment" to the United States Constitution.  *C.A.M.A.*, 154

Wn.2d at 60 (quoting *Smith*, 137 Wn.2d at 13).  It is essential to the protection of that

liberty interest that if a fit parent's decision to deny visitation to his or her child's

grandparents becomes subject to judicial review, "the court must accord at least some

special weight to the parent's own determination."  *Troxel*, 530 U.S. at 70.  It is also

constitutionally required "that a grandparent (or other third party seeking visitation) must

show that denial of visitation would result in harm to the child before a court [can] order

visitation over the objections of a fit parent."  *C.A.M.A.*, 154 Wn.2d at 61.

7

Chapter 26.11 RCW permits third parties to petition for nonparental visitation only if they are a relative and have an ongoing and substantial relationship with the child. The petition must be supported by an affidavit setting forth facts that support the requested order for visitation. RCW 26.11.030(5), (6). These must be "specific facts." *Cf. In re Custody of E.A.T.W.*, 168 Wn.2d 335, 346, 227 P.3d 1284 (2010) (construing RCW 26.10.032, dealing with nonparental custody, to require "specific facts").

If a hearing is conducted, the petitioner must prove two elements by clear and convincing evidence. The court must consider the parent's reason for denying visitation, and there is a statutory presumption that "a fit parent's decision to deny visitation is in the best interest of the child and does not create a likelihood of harm or a substantial risk of harm to the child." RCW 26.11.040(2). The first element a petitioner must prove is to rebut this presumption with clear and convincing evidence that the child would likely suffer harm or the substantial risk of harm if visitation is denied. RCW 26.11.040(1)-(3).

If the presumption is rebutted, the second element the petitioner must prove, again by clear and convincing evidence, is that visitation is in the child's best interest. RCW 26.11.040(4). The statute identifies a dozen nonexclusive factors to consider in making the "best interest" determination. RCW 26.11.040(4)(a)-(l).

Most importantly for this case, the parent will not be subjected to an evidentiary hearing unless the court finds it is more likely than not that visitation will be granted if a

8

hearing is held. RCW 26.11.030(8). This threshold determination of whether the petition

has a likelihood of success is "based on the petition and the affidavits." *Id.*

B.      *Standard of appellate review*

The appropriate standard of review is a question of first impression; both parties

assume that the abuse of discretion standard applies. An abuse of discretion standard is

strongly supported by *In re Parentage of Jannot*, 149 Wn.2d 123, 126, 65 P.3d 664

(2003), which held that adequate cause determinations in actions to modify a parenting

plan are reviewed for an abuse of discretion, not de novo, even though they are based on

affidavits that are equally available to the appellate court. It explained:

> [A] trial judge . . . stand[s] in a better position than an appellate judge to
> decide whether submitted affidavits establish adequate cause for a full
> hearing on a petition to modify a parenting plan. . . .
>         First, many local trial judges decide factual domestic relations
> questions on a regular basis, [*In re Parentage of*] *Jannot*, 110 Wn. App.
> [16,] 21,[ 37 P.3d 1265 (2002)], and the adequate cause determinations at
> issue here often involve facts that are very much in dispute. [*In re
> Marriage of* ]*Maughan*, 113 Wn. App. [301], 305[, 53 P.3d 535 [(2002)]
> . . . . Because adequate cause determinations are fact intensive, we
> recognize that a trial judge generally evaluates fact based domestic relations
> issues more frequently than an appellate judge and a trial judge's day-to-
> day experience warrants deference upon review.
>         Moreover, parenting plans are individualized decisions that depend
> upon a wide variety of factors, including "culture, family history, the
> emotional stability of the parents and children, finances, and any of the
> other factors that could bear upon the best interests of the children."
> *Jannot*, 110 Wn. App. at 19-20. The combination of relevant factors and
> their comparative weight are certain to be different in every case, and no
> rule of general applicability could be effectively constructed. *See id.* at 20.
> The very nature of a trial court makes it better suited than an appellate court

to weigh these varied factors on a case-by-case basis. *Maughan*, 113 Wn.
App. at 305; *Jannot*, 110 Wn. App. at 20.

*Jannot*, 149 Wn.2d at 126-27. These considerations have equal application in reviewing a trial court's decision on a petition for relative visitation. The Washington Supreme Court has also applied an abuse of discretion standard in reviewing a trial court's adequate cause determination in nonparental custody cases, observing that trial courts are given broad discretion in matters dealing with the welfare of children. *In re Custody of L.M.S.*, 187 Wn.2d 567, 574, 387 P.3d 707 (2017) (citing *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993)).

The abuse of discretion standard applies. "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Id.* at 574 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

II.     ISSUES ON APPEAL

A.      *The trial court's finding was sufficient*

The Naravanes argue that the trial court was required to support its finding that visitation was unlikely to be granted with more specific findings. At the threshold stage, however, the only finding explicitly required by the statute is for the court to find whether the petitioner has demonstrated the required likelihood of success. RCW 26.11.030(8). If it has, the statute requires the scheduling of a hearing. *Id.*

10

No. 36834-3-III
*Naravane v. Vinther*

The only authority the Naravanes cite in asking us to imply a requirement for more specific findings are mandatory family law forms 140 (Parenting Plan) and 231 (Findings and Conclusions about a Marriage), which they point out require additional findings.[4] But in the case of a parenting plan, unless the parents reach agreement, the plan is only entered after a trial. *See* RCW 26.09.181(5), (6). And dissolution actions are governed by the practice in civil actions tried to the bench, including the requirement for findings on factual disputes that are tried. RCW 26.09.010(1); CR 52(a). Where facts are tried or agreed, findings can be made. Here, the threshold decision on the Naravanes' likelihood of being granted visitation was required to be made before an evidentiary hearing. The trial court was in no position to make findings on disputed facts and did not err by failing to do so.

B.      *The trial court did not abuse its discretion in making a threshold finding that the Navaranes failed to demonstrate a likelihood of being granted visitation*

Several features of chapter 26.11 RCW evince the legislature's intent that a parent should be subjected to a hearing on a relative visitation petition only in compelling circumstances. One is the requirement that the relative petitioning for visitation generally pays the parent's legal expenses. Another is that a relative's evidence of an emotional connection and bond with the child, however sympathetic, might not even be relevant. It

---

[4] The mandatory forms are available at https://www.courts.wa.gov/forms/?fa=forms.contribute&formID=13.

11

will be relevant only if the petitioning relative first overcomes the presumption that the parent is acting in the child's best interest. A third is that the petitioning relative will not receive an evidentiary hearing without first showing, by clear and convincing evidence, that the court will more likely than not order visitation.

It is illuminating to contrast this threshold showing with the threshold "adequate cause" showing required to obtain an evidentiary hearing in a nonparental custody proceeding. In that setting, the substantive burden is more difficult[5] but procedurally, the petitioner is more likely to be entitled to a hearing. To show "adequate cause" for a hearing in a nonparental custody case, the petitioner must "allege specific facts that, if proved true, would establish a prima facie case." *L.M.S.*, 187 Wn.2d at 576. Stated differently, the trial court in that context reviews whether there is a genuine issue of material fact. In a relative visitation case, demonstrating a genuine issue of material fact does not entitle a petitioner to a hearing. Instead, the petitioner must allege specific facts that, if proved true, would more likely than not clearly and convincingly establish her or his right to court-ordered visitation.

In making this threshold ruling a trial court may find that disputed facts, even if decided in the petitioner's favor, would not clearly and convincingly overcome other

---

[5] To obtain custody, a nonparent must show "that the parent is unfit or that placing the child with the parent would result in actual detriment to the child's growth and development." *E.A.T.W.*, 168 Wn.2d at 338.

facts that are either undisputed or apparent. For the following reasons, the trial court could reasonably make that finding here.

> *Element One: rebutting Mr. Vinther's reasons for denying visitation with clear and convincing evidence of harm*

In the event of a hearing, the Naravanes would first be required to rebut Mr. Vinther's reasons for denying visitation with clear and convincing evidence that his children would likely suffer harm or the substantial risk of harm if visitation was not granted. RCW 26.11.040(3). Mr. Vinther explained his reasons for denying visitation:

> What the Petitioners do not understand, is their repeated actions and disregard for me as a parent, their dishonesty and lack of insight, their willingness to manipulate and undermine me as a parent, are the reasons they do not have a relationship with my children.

CP at 39. Elsewhere, he explained that he did not trust the Naravanes' intentions when it came to his children because "they have . . . made it very clear how capable and willing they are to dismiss me as my children's father, and substitute their own judgement [sic] as to what is best for my children," adding, "I do not miss the near constant state of alert and stress the kids and I were in, when the Naravanes were a part of our lives." CP at 167-68.

The fact that the Naravanes brought a nonparental custody action without evidence that Mr. Vinther was an unfit parent or a danger to his children supports his concern. It would be the rare parent whose trust in his in-laws would not be badly scarred by the Naravanes' actions in November 2016.

13

Portions of the Naravanes' petition and declarations in this action also tend to prove Mr. Vinther's point. One would expect them to be circumspect about criticizing his parenting. Yet in the joint declaration supporting their petition, they accuse Mr. Vinther of "incredibly poor judgement" [sic] and a "callous disregard" because he announced his relationship with Cheyenne shortly after Angela's death. CP at 11. They say that by moving in with Cheyenne and her children, Mr. Vinther's children "now had to move in with a mother figure they did not know and her three kids," something they characterize as a "foreign family dynamic." CP at 11-12. They describe this as Mr. Vinther's "extreme haste to replace Angela," although it was Angela who had left Mr. Vinther 15 months earlier. CP at 12. They go so far in their briefing as to refer to Cheyenne as "Ms. Reynolds" even after she married Mr. Vinther and took his name, "out of respect[ ] for the Naravane's deceased daughter." Appellant's Br. at 6, n.2.

The facts, however, are that as of late October, Mr. Vinther and Angela had been living separately for 15 months and were getting divorced. Angela had moved on to other relationships and so had Mr. Vinther. He was on the verge of becoming engaged to Cheyenne. Mr. Vinther could not have anticipated Angela's suicide. After it occurred, he expected and intended to resume custody of his children very soon. Cheyenne would be their stepmother. Her children would be their stepsiblings. It appears Mr. Vinther handled an unavoidably life-altering situation for his children in the manner he thought best. The Navaranes' submissions reveal their belief that they know better than Mr.

14

Vinther what is best for his children and have difficulty keeping those thoughts to themselves.

The Naravanes profess to have "no plans . . . [to talk] poorly about [Mr. Vinther] or undermin[e] him to his children." CP at 82. But the statutory presumption, the Navaranes' past actions, the tenor of their submissions, and their willingness to fight him on a legal expense issue that was financially inconsequential to them could raise doubt that in the event of a hearing, they would clearly and convincingly rebut his concerns.

To rebut Mr. Vinther's concerns, the Naravanes identified the following likely harms or risks of harm to the children if visits were denied:

- The children will be "wholly cut off from half of their heritage" and lose a connection to their mother and her family,
- Mr. Vinther's "extreme haste to replace Angela" by moving in with Cheyenne must have been due to "a sense of overwhelm that he would have to raise four children by himself," and
- Being "ripped away" from the Naravanes and "ha[ving] to move in with a mother figure they did not know and her three kids" caused the children to experience "mental and emotional harm."

*See* CP at 11-12. The Navaranes offered no specific facts in support of the second and third alleged harms, so they are entitled to no weight.

Being "cut off from half of a child's heritage," without more, cannot be characterized as harm under the Washington Supreme Court's decision in *Smith.* In holding in that case that a "best interest of the child" standard is insufficient to serve as a compelling state interest overcoming a parent's fundamental rights, the Court examined

15

the sources of state power to intrude on family life, and found that all required a need to protect health or safety, or prevent psychological or physical injury to a child. 137 Wn.2d at 15-20. Among its examples was the United States Supreme Court's decision in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), in which the State sought to extend the benefit of secondary education to Amish children whose parents objected to their children attending public school after completion of the eighth grade. *Yoder* held that the parents' decision about secondary education for their children "was 'not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred.'" *Smith*, 137 Wn.2d at 17 (quoting *Yoder*, 406 U.S. at 230). The Washington Supreme Court concluded in *Smith* that "[s]tate intervention to better a child's quality of life through third party visitation is not justified where the child's circumstances are otherwise satisfactory." *Id.* at 20.

Absent countervailing considerations, a child's life is enriched by the insights into the child's parents and family history that can be gained by getting to know both sides of the family. But the absence of that connection, standing alone, is not harm justifying state intervention.

Finally, we note that Mr. Vinther's two oldest children are now teenagers and soon will be old enough to decide for themselves whether to spend time with the Naravanes.

16

The trial court could reasonably find that the Naravanes were unlikely to clearly and convincingly prove the first required element of a relative visitation claim.

*Element Two:  Best interest of the children*

Several of the statutory factors considered in determining the best interest of a child are unlikely to be disputed and are not disputed here.  There was no dispute at the time of the trial court's decision that for the prior two and a half years, the Naravanes had not had more than a few instances of fleeting contact with the children.  Those contacts had not gone well.  There was some dispute, but not much, about the length and quality of the Naravanes' prior role and relationship with the children: for the vast majority of the children's lives, they had a long-distance relationship with the Naravanes.  Mr. Vinther testified that because he was in the Air Force,

> we lived in many different places.  The Naravanes visited us and we visited them, just like many families do, but the majority of contact with the Naravanes was by phone and online messages.  During that time, the Naravanes were not a daily part of my children's lives.  After Angel moved to Washington and then to Oregon, the Naravanes played a bigger role in the children's lives because Angel lived with the Naravanes or close to them for about a year and a half.

CP at 168.

It was clear from the parties' submissions that the Naravanes' and Mr. Vinther's relationship had gone from good, to poor, to nonexistent.  Mr. Vinther has made clear the nature and reason for his objection to the Naravanes' request for visitation.

17

A relatively recent law review article points out that two primary indicators for children's success, according to scientific study, are financial stability and being raised in a low-conflict environment. Pamela Laufer-Ukeles, *The Relational Rights of Children*, 48 CONN. L. REV. 741, 762-63 & n.103-106 (2016). The author observes that while the research has mostly been developed in the context of divorce, "When parents or by extension, grandparents, and other caregivers have high levels of stress between them, such tension and conflict affect children." *Id.* at 764. She observes that the stress and conflict also "deeply affect [the children's] caregivers, undermining their ability to care." *Id.*

On the Navaranes' side, it was undisputed that Mr. Vinther's refusal to allow visitation was cutting the children off from Angela's side of the family, at least while they are minors. The death of a parent is not infrequently the source of visitation disputes, so it is perhaps noteworthy that the legislature did not identify "preserving a connection to the family of a deceased parent" as a factor to be considered in determining the "best interest" element of a relative visitation claim. The trial court could nonetheless consider it as an "other factor relevant to the child's best interest" under RCW 26.11.040(4)(k).

Against these undisputed factors, the trial court was presented with the Naravanes' disputed contention that they had a close relationship and bond that was valuable to the children. The Navaranes' evidence on this score tended to be conclusory rather than

18

specific. Apart from the three months before her suicide when Angela left the children with the Navaranes and the six weeks the children were withheld during the nonparental custody proceeding, the evidence presented by the Naravanes about how often, when and where they spent time with the children included few specifics.

Given the undisputed evidence that the Navaranes' relationship with the children had for the most part been a long-distance relationship, that there had been no relationship for two and a half years, and that their actions and criticism had resulted in an emotionally charged conflict with Mr. Vinther, the trial court could reasonably have found that whatever connection, bond and other benefit to the children the Navaranes could prove would not clearly and convincingly outweigh the harm to the children of court-ordered visitation.

Since the record can support it, we defer to the trial court's conclusion that the Naravanes failed to demonstrate the required likelihood of success. It did not abuse its discretion in dismissing the petition.

Mr. Vinther requests an award of reasonable attorney fees and costs on appeal under RAP 18.1(a) and RCW 26.11.050(1)(a). The Navaranes again oppose an award of fees. They make no argument that considering the parties' financial resources, it would be unjust to award them. Instead, they argue that RCW 26.11.050(1)(a) does not provide for an award of fees at the appellate level.

No. 36834-3-III
*Naravane v. Vinther*

The statute does not need to provide for an award of fees on appeal. When a statute allows an award of attorney fees to a party at trial, the appellate court has inherent authority to make such an award on appeal. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 247, 23 P.3d 520 (2001); *Granite Falls Library Capital Area v. Taxpayers of Granite Falls Library Capital Area*, 134 Wn.2d 825, 843, 953 P.2d 1150 (1998).

Mr. Vinther is awarded his reasonable fees and costs on appeal subject to his timely compliance with RAP 18.1(d).

Affirmed.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Korsmo, A.C.J.