## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Guardianship of:<br><br>J.P.C.J.,<br><br>A minor child. | No. 58626-6-II<br><br>UNPUBLISHED OPINION |

LEE, J. — JJ, JPCJ's biological father, appeals a trial court order granting JM's petition, filed pursuant to RCW 11.130.185 (the nonparental guardianship statute), for a minor guardianship over JPCJ. The guardianship order appointed JM as the limited guardian of JPCJ with sole decision-making authority over JPCJ's care, but the order allowed JJ to access records related to JPCJ's care. The guardianship order also gave JJ structured visitation rights that would gradually increase over time.

JJ argues that the trial court violated the appearance of fairness doctrine. JJ also challenges numerous findings of fact and contends that the guardianship order violates his right to parent JPCJ.

We affirm the trial court's guardianship order.

## FACTS

### A.     BACKGROUND

RG and JJ met in 2007, and in 2010 RG moved from New York to Washington to live with JJ. JPCJ was born in 2011. RG and JJ separated in 2013. Around the time RG and JJ separated, JJ was arrested and incarcerated for a fourth degree domestic violence assault of RG, leading to a

domestic violence no contact order. After JJ was released from custody, he violated the no contact order several times, leading to further arrests and incarceration.[1]

RG initiated proceedings to establish a parenting plan for JPCJ, but JJ did not participate in the proceedings. In 2015, the trial court entered a default parenting plan for JPCJ. The parenting plan allowed JJ to have supervised visitation with JPCJ for two hours twice a week. JJ never sought visitation with JPCJ under the parenting plan.

In approximately 2015, RG began dating JM and later got engaged to him. Within a few years, RG and JPCJ moved in with JM, who shared parenting duties and acted as JPCJ's stepfather.

RG passed away on December 9, 2022. On December 14, JM petitioned for minor guardianship of JPCJ under RCW 11.130.185, the nonparental guardianship statute.

B.     GUARDIANSHIP HEARING

At the initial hearing on JM's petition in December 2022, JJ objected to the guardianship. Because JJ opposed the guardianship, the trial court appointed attorneys for JJ and JPCJ. The trial court then entered an order for an emergency minor guardianship while proceedings were pending. The judge at the initial hearing knew JJ from drug court, which caused JJ to then ask the judge to recuse based on an alleged conflict of interest. The judge recused.

At a preliminary hearing in March 2023, JJ expressed concern about the cost of supervised visitation. The trial court stated that it would reach out to the recused judge, who had more experience in family law court, to "find out if she knows of what mechanism we can use" to help

---

[1] Due to the assault and repeated no contact order violations, the State began dependency proceedings to remove JPCJ from RG's care, allegedly because of the risk of domestic violence from JJ. The State ultimately dismissed the dependency.

the court pay for the cost of supervised visitation. Verbatim Rep. of Proc. (VRP) at 48. JJ did not object to the trial court contacting the recused judge about his case.

After the hearing, the trial court entered an order continuing the emergency guardianship. The order allowed JJ to have weekly supervised visits and twice-weekly phone or video calls with JPCJ. The parties confirmed that they had each other's phone numbers and could contact each other through Facebook Messenger to schedule phone calls and visits.

After a break in proceedings, the trial court stated that during the break, it "went and looked at the file and the history and the family law case as well." VRP at 173. Based on this, the trial court observed that "one of the barriers" to JJ keeping in contact with JPCJ was "the supervised visit provision." VRP at 173. JJ agreed, stating, "It feels like I need to pay a ransom to see my son." VRP at 173. Based on this exchange, the trial court asked JM to help facilitate and supervise visits between JJ and JPCJ during the course of proceedings, which JM agreed to do.

Between the filing of the guardianship petition in December 2022 and at the beginning of the guardianship hearing in May 2023, JJ did not seek any in-person visitation with JPCJ and only called JPCJ twice.

1.      Testimony About JJ's Ability to Parent

JPCJ did not attend the guardianship hearing, but his attorney read his written statement into the record. JPCJ stated that he wanted to live with JM because JM was "more stable," while JJ had been "in and out of jail" and did not call JPCJ on his birthday or when RG died. VRP at 94. JPCJ called JM his "one and true dad," but JPCJ asked to have visits and phone calls with JJ. VRP at 94.

JJ testified about his role in JPCJ's life. JJ had four children, all with different mothers; JPCJ was his second-oldest. JPCJ was two years old when his parents separated in 2013. JJ testified that before he and RG separated, JPCJ lived with JJ's sister and mother for about eight months before they returned him to RG.[2]

JJ also testified that he provided JPCJ housing and clothing before JPCJ was "taken away" in 2013. VRP at 127. He thought RG had left Washington from 2014 to 2018, so he did not try to have contact with JPCJ during that period. But even after learning that RG and JPCJ were still in Washington in 2018, JJ did not seek to enforce the parenting plan or have regularly scheduled visitation with JPCJ. Beginning in 2020, JM reached out to JJ to coordinate visits between JJ and JPCJ. This resulted in a handful of successful visits between 2020 and 2022, including an encounter at a Chuck E. Cheese where JPCJ was able to spend time with his paternal aunt and grandmother.

JJ was incarcerated for the majority of JPCJ's life. JJ's criminal history includes convictions for several violations of no contact orders in 2012 and 2013, and for taking a motor vehicle without permission in 2017. At the time of the guardianship hearing, JJ had been participating in drug court since 2021, and was expected to graduate in the summer of 2023. JJ also had an active misdemeanor warrant for missing work crew.

At the time of the guardianship hearing, JJ lived in a recovery house with his girlfriend and his youngest son. JJ's youngest son was living with him on a trial return home basis resulting from

---

[2] JJ's sister's testimony confirmed that JPCJ lived with her for about six months "when [JPCJ] was an infant." VRP at 298.

a second dependency proceeding that began while JJ was incarcerated in 2022.[3] JJ did own property, but the house on that property had burned down and was not habitable. JJ testified that he planned to build either a business or a permanent residence on the property "within a year." VRP at 98.

Also at the time of the hearing, JJ worked two jobs as a cook, and his work schedule frequently changed. JJ did not know what grade in school JPCJ was in, where JPCJ went to school, or any of JPCJ's teachers or doctors. JJ testified that in 2018, he asked to be involved in JPCJ's education, but RG denied that request.

JJ explained that he did not seek visitation or call JPCJ more than twice during the pendency of the guardianship proceedings, despite the interim visitation plan, because his work schedule had changed. Rather than contact JM to explain the situation and change the designated phone call times, JJ "decided not to and just wait[ed] until [he] was to appear in court again." VRP at 135. Later, JJ claimed that he did not have JM's phone number saved, so he could not schedule phone calls. JJ also stated that he refused to seek visits because they would have to be supervised, which he described as "pay[ing] a ransom to see [his] son." VRP at 309.

JJ further testified that he opposed the guardianship, not because he thought that JM lacked parenting abilities, but because he believed JPCJ did not have an accurate idea of why JJ had not been more involved in his life. JJ stated that he did not want to have JPCJ move in with him as soon as guardianship proceedings concluded; rather, JJ wanted gradually increasing visitation with

---

[3] JJ's social worker testified that the Department of Children, Youth, and Families expected to dismiss the dependency involving JJ's youngest son within a month. She stated that there would be no concern with the dependency case if JPCJ also moved in with JJ.

JPCJ. Given that this position resembled a limited guardianship, the trial court encouraged JJ to come to an agreement with JM rather than having "a stranger—someone who doesn't know [JPCJ] like you all know him—deciding the outcome of this proceeding." VRP at 153. The trial court also stated that it had spoken to the recused judge, who had expressed "how proud she is of the work" JJ was doing in drug court. VRP at 154. When JJ resisted the suggestion to accept a limited guardianship, the trial court observed that "if this [case] is headed in the direction it appears to be headed" and because JPCJ appeared to favor a guardianship, JJ risked derailing his attempts to rebuild his relationship with JPCJ by blocking the guardianship, possibly causing JPCJ to resent JJ. VRP at 155.

2.    Testimony About JM's Guardianship Qualifications

JM testified that he worked as a welder 20 minutes from the home where he lived with JPCJ, and he changed his schedule after RG died so that he could care for JPCJ. JM and RG shared parenting duties for JPCJ after RG and JPCJ moved in with him, and JPCJ addressed him as "dad" for the last four or five years. VRP at 216. JM could name JPCJ's dentist, primary care doctor, optometrist, and therapist, and JM could list when JPCJ's next appointments were for each. JM described JPCJ's favorite food and color and testified that they did activities together such as riding motorcycles, attending church and concerts, fishing, and perusing garage sales. JM would discipline JPCJ for misbehavior by restricting his electronics time.

JM had a history of property crime, but his last conviction was in 2010. JM graduated from drug court and had been sober for over 11 years.

JM attempted to present evidence that he had completed a guardianship training program, but JJ objected to the form submitted. The trial court explained that there was a required template

6

which was "kind of hard to find" on the court's website. VRP at 116. The trial court explained, "I had to do some digging myself and I keep copies of it just for all the various parties that come before me." VRP at 116. JJ did not object when the trial court provided JM's counsel with a copy of the correct template. Later, the trial court gave JM's counsel another form related to JM's financial status and criminal history. JJ again did not object.

One of RG's former coworkers, who was a social worker, testified that she saw the family regularly, JM was a supportive parent, and JPCJ trusted JM.

3.    Trial Court Ruling

The trial court entered a guardianship order and appointed JM as a limited guardian for JPCJ until 2029, when JPCJ would turn 18. In its order, the trial court made the following findings of fact relevant to this appeal:

> 9. Basis for Guardianship
> . . . .
> [JJ] is not willing or able to provide for the support, care, education, health, safety, and welfare of a child under age 18 (exercise the parenting functions in RCW 26.09.004).
> . . . .
> [9.]6.  The testimony presented included a history of [JJ] not providing a loving, stable, nurturing, drug-free, non-tumultuous family environment for the child.  On the contrary, the petitioner has provided a loving, stable, nurturing home environment as indicated by the child in his written statement wherein he stated he [w]as "very happy"[.]
> [9.]7. The[re was] testimony presented at trial by the petitioner that [JJ] has not attended to the feeding, clothing, and daily needs for the child.  [JJ] testified that [JM] has provided for those items since the passing of [RG].  [JM] stated that [JJ] has not consistently attended to the above-described needs of the child. . . .
> [9.]8.  [RG] (prior to her demise) and [JM] (since [RG's] demise) have attended to all of the needs for the education of the child.  [JJ] has not attended to any of the needs for the education of the child.
> [9.]9.  [RG] (prior to her demise) and [JM] (since [RG's] demise) have attended to the needs of the child for developing interpersonal relationships.  [JM]

7

encouraged [JJ] to visit and spend time with the child. [JJ] has not attended to these interpersonal needs of the child.

[9.]10. [RG] (prior to her demise) and [JM] (since [RG's] demise) have exercised all judgment for providing services to the child. [JJ] has made strides in performing parenting functions and has asserted that he loves and cares for the child (which the Court does not question), for example[, JJ's] testimony regarding getting grief counseling for the child.

[9.]11. [JJ] is parenting his younger son, [J], at this time, while a dependency is proce[eding] and with the oversight of DCYF. The Court recognizes that he has done "great work" with his younger son [J]. That evidence is specific to [J], but not to [JPCJ].

[9.]12. There was no testimony of any child support being paid by [JJ]. There was testimony that the child received some gifts since 2019.

. . . .

[9.]14. Based on the foregoing Findings of Fact, the Court enters its Conclusions of Law:

(a) There is clear and convincing evidence that no parent of the minor is willing or able to exercise parenting functions as defined in RCW 26.09.004. The minor's mother, [RG], is deceased. The minor's father, [JJ], is not able to exercise the parenting functions as defined in RCW 26.09.004.

(b) Pursuant to RCW 26.09.004(a), parenting functions include maintaining a loving, stable, consistent, and nurturing relationship with the child. Historically, [JJ] has not maintained a relationship with [JPCJ]. The evidence shows that there was limited and inconsistent contact between [JJ] and the child in 2020 and 2021. Prior to that limited contact in 2020 and 2021, [JJ] had no contact with the child in years.

(c) Pursuant to RCW 26.09.004(b), parenting functions include attending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family. The evidence shows that [JJ] has not attended to the daily needs of the child. [JM] and [RG] were the only parents providing for [JPCJ's] daily needs. [JM] was the only adult fostering reconnection with [JJ], and historically [JJ] would not engage in contact with his child. When given court-ordered opportunities to visit with the child, [JJ] engaged in only 37 minutes of telephone contact with the child and did not exercise his opportunity to have in-person visitation with the child.

(d) Pursuant to RCW 26.09.004(c), parenting functions include attending to adequate education for the child, including remedial or other education essential to the best interest of the child. Only [JM] and [RG] attended to [JPCJ's] education. [JJ] has never attended to any educational needs of [JPCJ].

(e) Pursuant to RCW 26.09.004(d), parenting functions include assisting the child in developing and maintaining appropriate interpersonal relationships. Only

[JM] and [RG] attended to these needs. [JM] facilitated the contact between [JJ] and [JPCJ].

(f) Pursuant to RCW 26.09.004(e), parenting functions include exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances. Only [JM] and [RG] provided for this need. [JJ] did suggest grief counseling for [JPCJ] after [RG's] passing, but otherwise has not engaged in appropriate judgment for [JPCJ].

(g) Pursuant to RCW 26.09.004(f), parenting functions include providing for the financial support of the child. [JJ] has not provided financially for [JPCJ]. [JJ] has only provided gifts sporadically in the last few years.

. . . .

11. Limits on Guardian's Authority

. . . .

The guardian should share access to records with parent[] . . . because [JJ] should be able to be kept up to date with the child's medical, dental, psychological, and educational records.

Other findings: The Guardian has sole-decision making over the child and does not have to share decision making with [JJ].

12. Limits on Parents

. . . .

The court has ordered a graduated visitation program that allows [JJ] the opportunity to increase visitation over time. It is attached hereto as Exhibit A and is incorporated herein by this reference.

The court should limit decision-making and visitation for the following reasons: Mandatory limiting factors from RCW 26.09.191(2) . . .

Abandonment – [JJ] intentionally abandoned the child . . . for an extended time between 2015 and 2023.

Neglect – [JJ] substantially refused to perform his parenting duties for [the] child . . . between 2015 and 2023.

. . . .

Other limiting factors from RCW 26.09.191(3) . . .

. . . .

Substance abuse – [JJ] has had a long-term problem with drugs, alcohol, or other substances that has gotten in the way of his ability to parent. [JJ] has made substantial progress in his recovery to avoid substance abuse getting in the way of his relationship with [JPCJ].

Clerk's Papers (CP) at 49-54 (underline, italics, and boldface omitted). While the trial court imposed a phased visitation plan that would allow JJ to spend progressively more time with JPCJ, the court ordered that if JJ had three unexcused missed visits in a row, all future visitation would

be at JM's discretion. The court also allowed JM to "expand the visit times and/or schedule" at his discretion. CP at 63. And JPCJ could call JJ whenever he wanted.

JJ appeals the trial court's guardianship order.

## ANALYSIS

A. APPEARANCE OF FAIRNESS

JJ argues that the trial judge violated the appearance of fairness doctrine by "overtly helping" JM "meet the requirements for guardianship" by providing JM's counsel with several forms from the court website. Br. of Appellant at 16. JJ also argues that the trial judge violated the appearance of fairness doctrine by discussing the case with a disqualified judge, commenting on "'the direction [the case] appears to be headed,'" and reviewing facts not in the record. Br. of Appellant at 18. We disagree.

Under the appearance of fairness doctrine, a judge must both be impartial and appear impartial. *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). A judicial proceeding is valid as required by the doctrine "if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). This inquiry "is an objective test that assumes a reasonable observer knows and understands all the relevant facts." *Id*. To succeed, "[t]he party asserting a violation of the appearance of fairness must show a judge's actual or potential bias." *Id*.

However, "[t]he doctrine of waiver applies to bias and appearance of fairness claims." *State v. Morgensen*, 148 Wn. App. 81, 91, 197 P.3d 715 (2008). "Because a claim challenging the appearance of fairness is not considered a 'constitutional' claim under RAP 2.5(a)(3), an appellate court will generally decline to consider the issue for the first time on appeal." *Tacoma S. Hosp.,*

*LLC v. Nat'l Gen. Ins. Co.*, 19 Wn. App. 2d 210, 220 n.2, 494 P.3d 450 (2021); *see also City of Bellevue v. King County Boundary Rev. Bd.,* 90 Wn.2d 856, 863, 586 P.2d 470 (1978) ("Our appearance of fairness doctrine, though related to concerns dealing with due process considerations, is not constitutionally based.").

We have held that a defendant who did not object to his former defense counsel serving as the trial judge on an unrelated charge waived his ability to assert an appearance of fairness violation for the first time on appeal. *Morgensen*, 148 Wn. App. at 91. In short, "[t]rial counsel cannot stay silent to preserve an issue for possible future appeal." *Id*.

Here, JJ never objected to the trial court providing opposing counsel with standardized forms, to the trial judge's characterization of the case based on the evidence presented, to the trial judge's comments about communicating with the disqualified judge about mechanisms to help pay for supervised visitation, or to the trial judge reviewing the original parenting plan. And JJ never questioned the trial court's fairness or asked the judge to recuse. While we recognize that there may be circumstances where raising an objection is not required to preserve an appearance of fairness claim, the facts of this case do not present such a scenario.

Even had JJ objected, there is no evidence that the trial court showed bias towards JM because the record shows that the trial court kept copies of forms relating to the new guardianship law available for any party that may need them because the forms were difficult to find online. Also, the trial court's statement that, in preparation for trial, it "went and looked at the file and the history and the family law case as well" does not establish that the trial court sought out improper extrinsic evidence. VRP at 173. Neither of these instances establish actual or potential bias. *Solis-Diaz*, 187 Wn.2d at 540. And JJ does not cite any authority establishing that a trial judge

communicating with a recused judge constitutes actual or potential bias. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). Thus, even if JJ had objected, JJ's appearance of fairness claim fails.

B.      CHALLENGED FINDINGS OF FACT AND CONCLUSIONS OF LAW

JJ argues that numerous findings of fact and conclusions of law in the guardianship order should be vacated. Specifically, JJ challenges paragraphs 9, 9.6-9.12, 9.14(a)-(g), 11, and 12 of the guardianship order. He also contends that some of the paragraphs are factual findings unsupported by substantial evidence, while others are erroneous legal conclusions.

"It is well-established that the labels used by the juvenile court do not control our review of findings of fact and conclusions of law." *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019). Findings of fact that have been erroneously described as conclusions of law are reviewed as findings of fact, while conclusions of law erroneously described as findings of fact are reviewed as conclusions of law. *Id*.

We review challenges to a trial court's factual findings for substantial evidence. *In re Guardianship of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). "Substantial evidence exists so long as a rational trier of fact could find the necessary facts were shown by a preponderance of the evidence." *Id*. A trial court's unchallenged findings of fact are verities on appeal. *Merriman v. Cokeley,* 168 Wn.2d 627, 631, 230 P.3d 162 (2010). And a "reviewing court should not decide the credibility of witnesses or weigh the evidence." *A.W.*, 182 Wn.2d at 711. "'Appellate courts are generally reluctant to disturb a child custody disposition because of the trial court's unique

opportunity to personally observe the parties.'" *In re Custody of C.D.*, 188 Wn. App. 817, 826, 356 P.3d 211 (2015) (quoting *In re Custody of Stell*, 56 Wn. App. 356, 366, 783 P.2d 615 (1989)).

"A person becomes a guardian for a minor only on appointment by the court." RCW 11.130.185(1). A court may appoint a guardian for a minor "if the court finds the appointment is in the minor's best interest" and one of three conditions is met: all parents consent to the guardianship, all parental rights have been terminated, or "[t]here is clear and convincing evidence that no parent of the minor is willing or able to exercise parenting functions as defined in RCW 26.09.004." RCW 11.130.185(2)(a)-(c). Parenting functions include "[m]aintaining a loving, stable, consistent, and nurturing relationship with the child;" attending to the child's daily needs "such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child;" providing adequate education; assisting the child in developing relationships; "[e]xercising appropriate judgment regarding the child's welfare;" and financially supporting the child. RCW 26.09.004(2)(a)-(f).

Here, JJ testified that he did not try to contact JPCJ for years because he thought RG had left Washington with the child. But even after JJ learned that JPCJ was still in Washington, he did not try to contact JPCJ until JM reached out to arrange visitation. While guardianship proceedings were pending, JJ never tried to see JPCJ in person and only called him twice. Although JJ claimed that this was due to his changing work schedule, JJ did not communicate this to JM nor did JJ try to find different times to talk to his son. Instead, JJ "decided not to and just wait[ed] until [he] was to appear in court again." VRP at 135. And JPCJ's written statement complained that JJ did not call JPCJ on his birthday or when RG died. This was substantial evidence that clearly and

convincingly showed JJ was not willing or able to maintain "a loving, stable, consistent, and nurturing relationship with the child," assist "the child in developing and maintaining appropriate interpersonal relationships," or exercise "appropriate judgment regarding the child's welfare." RCW 26.09.004(2)(a), (d), (e). Accordingly, there was substantial evidence to support the trial court's findings related to these factors (9.6, 9.9, 9.10, and 9.11).

Also, the evidence showed that JJ provided for JPCJ's financial and daily needs after his birth in 2011 until he was removed from JJ's care in 2013, except when JJ's sister and mother cared for JPCJ during at least six months of that two-year time period. Since 2013, JJ has provided JPCJ with only a handful of gifts and no other support. Further, JJ stated that one of his reasons for not seeking visitation with JPCJ was not wanting or being able to pay for supervision for the visits. JJ was participating in drug court, had two jobs with inconsistent schedules, and he had another child on trial return home from a dependency, which each took up significant amounts of JJ's time and resources. Despite his overall compliance with drug court, JJ had an active misdemeanor warrant for missing work crew at the time of the guardianship hearing. Taken together, this was substantial evidence that clearly and convincingly showed JJ was not willing or able to attend to JPCJ's daily needs or provide for his financial support. RCW 26.09.004(2)(b), (f). Thus, substantial evidence supports the trial court's findings related to these factors (9.7 and 9.12).

Finally, JJ testified that he tried to get involved in JPCJ's education in 2018, but RG rebuffed him. JJ did not offer any testimony or evidence that he tried to involve himself in JPCJ's education in the intervening years or after RG's death. JJ did not know where JPCJ went to school or any of his teachers. Thus, there was substantial evidence that clearly and convincingly supports

the trial court's finding that JJ had "not attended to any of the needs for the education of the child." CP at 50 (Finding of Fact 9.8).

In sum, we hold that there was substantial evidence to support the trial court's challenged findings. Next, we consider whether the trial court's findings supported its conclusions of law.

The trial court concluded that there was clear and convincing evidence that JJ was not able to exercise the RCW 26.09.004 parenting functions (Conclusion of Law (CL) 9.14(a)). In relevant part, the court concluded that JJ had not maintained a relationship with JPCJ, that JJ had not attended to JPCJ's daily needs, that JJ had not attended to JPCJ's educational needs, that only JM had assisted JPCJ in developing and maintaining interpersonal relationships, that JJ had generally not engaged in appropriate judgment regarding JPCJ's welfare, and that JJ had provided JPCJ gifts but no financial support (CL 9.14(b)-(g)). As described above, there was substantial evidence that JJ failed to perform the RCW 26.09.004 parenting functions. The findings relating to those parenting functions support the trial court's conclusions that JJ had not or could not perform those parenting functions. We hold that the trial court's findings supported its conclusions of law that JJ was not willing or able to perform parenting functions.

The trial court's other challenged conclusions stated that JJ could access JPCJ's health and educational records to be kept up to date, that JM did not have to share decision-making with JJ, and that JJ could exercise a graduated visitation plan (CL 11, 12). The trial court based these conclusions on the finding that JJ intentionally abandoned JPCJ "for an extended time between 2015 and 2023" and "substantially refused to perform his parenting duties" for that same time period. CP at 53-54. The trail court also found that JJ's substance abuse had interfered with his ability to parent but that JJ had made substantial progress in his recovery. As discussed above,

15

there was substantial evidence that JJ chose to not seek involvement in JPCJ's life and that JJ's repeated incarcerations did not make any attempts at involvement easier. JJ only became involved in JPCJ's life with JM's intervention, and JJ only sought to assert a complete parental role after RG's death. These findings support the conclusion that JM, who is the established parental figure in JPCJ's life, should have sole decision-making as JPCJ's guardian and that JJ should have a limited role in JPCJ's life with increasing involvement.

We hold that there was substantial evidence to support the trial court's challenged findings, and that the trial court's findings supported its challenged conclusions.

## C. RIGHT TO PARENT

JJ argues that the guardianship order violated his constitutional right to parent. JJ asserts that, to secure a guardianship, "a petitioner must show either (a) that the parent is unfit, or (b) that placement with the parent 'would result in actual detriment to the child's growth and development.'" Br. of Appellant at 22-23 (quoting *In re Custody of L.M.S.*, 187 Wn.2d 567, 571, 387 P.3d 707 (2017)). JJ cites to *L.M.S.* and *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 344, 227 P.3d 1284 (2010), for support.[4] JJ also argues, without citation to authority, that the current nonparental guardianship "statute necessarily incorporates the constitutional standard set forth in *L.M.S.*" and *E.A.T.W.* Br. of Appellant at 24. JJ contends that this standard was not met in this case. We disagree with JJ.

Parents have a fundamental liberty interest in parenting their children, but that right may be infringed on in certain circumstances. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054,

---

[4] *L.M.S.* and *E.A.T.W.* predate the current nonparental guardianship statute, which was first enacted in 2019 and amended in 2020. RCW 11.130.185.

147 L. Ed. 2d 49 (2000). As discussed above, a court may appoint a guardian for a minor if the guardianship is in the minor's best interest and there is clear and convincing evidence that no parent is willing or able to exercise parenting functions. RCW 11.130.185(2)(c).

*L.M.S.* and *E.A.T.W.* addressed a prior version of the nonparental guardianship statute, former RCW 26.10.32(1) (2003). The old statute required only a declaration that the child was not in the physical custody of either parent and evidence demonstrating "that neither parent is a suitable custodian." Former RCW 26.10.032(1). *L.M.S.* and *E.A.T.W.* held that to pass constitutional muster, in addition to meeting the prior statute's standard, "the nonparent petitioner must allege specific facts that, if proved true, would establish a prima facie case 'that the parent is unfit or that placing the child with the parent would result in actual detriment to the child's growth and development.'" *L.M.S.*, 187 Wn.2d at 576 (quoting *E.A.T.W.*, 168 Wn.2d at 338).

JJ seeks to import *L.M.S.* and *E.A.T.W*'s constitutional requirements into the current nonparental guardianship statute. We reject his attempt to do so because those cases addressed a different statutory scheme.

The current nonparental guardianship statute requires a showing that the guardianship is in the child's best interest *and* that clear and convincing evidence demonstrates no parent is willing or able to exercise the list of parenting functions, which includes maintaining a loving relationship with the child and helping them develop other relationships, attending to the child's daily needs and education, exercising appropriate judgment about the child's welfare, and providing for the child's financial support. RCW 11.130.185(2)(c); RCW 26.09.004(2). We hold that if a trial court finds that the nonparental guardianship is in the child's best interest and that there is clear and convincing evidence that no parent of the child is willing or able to exercise the parenting functions

17

listed in RCW 26.09.004, those findings will satisfy the protections under the constitutional right to parent. Accordingly, a nonparental guardianship order issued in compliance with the current statutory scheme meets the constitutional threshold to avoid a violation of the constitutional right to parent.

Here, to the extent that JJ challenges the trial court's conclusion that the guardianship was in JPCJ's best interest and that clear and convincing evidence shows no parent is willing or able to exercise the list of parenting functions under RCW 26.09.004, the trial court's findings support its conclusions. The trial court found, based on the evidence presented, that JJ was not willing or able to provide for the support, care, education, health, safety, and welfare of a child under age 18 (exercise the parenting functions in RCW 26.09.004); JJ had not provided JPCJ a loving, stable, nurturing, drug-free, non-tumultuous family environment; JJ had not attended to JJ's feeding, clothing, and daily needs; JJ had not attended to visitation with JPCJ; JJ had not attended to any of JPCJ's needs for the education; JJ had not attended to JPCJ's interpersonal needs; and there was no evidence of JJ paying any child support for JPCJ. The trial court also found that JM had provided JPCJ with a loving, stable, and nurturing environment; JM had attended to JPCJ's feeding, clothing, and daily needs; JM had attended to JPCJ's educational and interpersonal relationship development needs; and JM had exercised all judgment for providing services to JPCJ since RG's death. These findings support the trial court's conclusion that the guardianship was in JPCJ's best interest and that no parent is willing or able to exercise the list of parenting functions under RCW 26.09.004.

Thus, the evidence supports the trail court findings and the trial court's findings support its conclusion that a limited guardianship for JPCJ should be ordered. No additional findings were

No. 58626-6-II

required to protect JJ's constitutional right to parent. The nonparental guardianship order did not violate JJ's constitutional right to parent.

CONCLUSION

We affirm the guardianship order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Glasgow, J.

19