# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Guardianship of: | No. 59281-9-II |
| C.G., | |
| A minor child. | UNPUBLISHED OPINION |

MAXA, P.J. – DG appeals the trial court's grant of a minor guardianship of his daughter CG to CG's maternal grandparents, Beth and Nicholas C.[1] BCC, CG's mother, is not a party to this appeal.

CG was born in Vancouver, Washington, to DG and BCC in February 2022. DG has a history of methamphetamine use and several prior convictions, including for encouraging child sexual abuse. He did not pay his bills and had his utilities shut off for a period of time while CG lived with him. But he continued to use methamphetamine.

Shortly after CG's birth, BCC and CG moved to Oregon to live with DG. In July 2022, DG and BCC separated. BCC moved in with her parents, Beth and Nicholas, in La Center, Washington. In November 2022, Beth and Nicholas filed a petition for minor guardianship of CG. In December 2022, DG filed for custody of CG in Oregon state court.

---

[1] We refer to Beth and Nicholas by their first names. No disrespect is intended.

The Washington trial court held a conference with the Oregon court under the Uniform Child Custody Jurisdiction and Enforcement Act, chapter 26.27 RCW (UCCJEA). The Oregon court declined to exercise its jurisdiction over CG, and the Washington court exercised its jurisdiction over the guardianship petition. After a trial in Washington, the trial court granted Beth and Nicholas guardianship of CG.

We hold that (1) the trial court properly exercised its jurisdiction over the guardianship proceeding under the UCCJEA, and (2) the trial court did not abuse its discretion in granting guardianship of CG to Beth and Nicholas.

Accordingly, we affirm the trial court's order granting guardianship of CG to Beth and Nicholas C.

FACTS

CG was born in Vancouver on February 11, 2022. DG and BCC are CG's parents. BCC and CG lived in Vancouver until February 28, when they moved to Keizer, Oregon, to live with DG. BCC lived in Keizer with DG until July 31, when she moved into Beth and Nicholas's home in La Center. Even while living with DG in Oregon, BCC and CG were at Beth and Nicholas's home in La Center a few days each week. BCC and CG lived in La Center with Beth and Nicholas until May 4, 2023, when they moved back to Oregon to live with DG.

DG has a criminal history. In 2011, DG was convicted in Oregon for second degree encouraging child sexual abuse and second degree assault. The second degree encouraging child sexual abuse conviction required DG to register as a sex offender. In 2017, DG pleaded guilty in Oregon to possession of methamphetamine. In 2019, he pleaded guilty to identity theft in Oregon.

2

In March 2022, the Oregon Department of Human Services opened an investigation into DG for a threat of harm to CG. The investigation resulted in an unfounded determination.

Beth and Nicholas filed a petition for a minor guardianship of CG in November 2022. They submitted a declaration describing in detail DG's criminal history and many alleged parenting deficiencies of both DG and BCC.

The trial court appointed Beth and Nicholas as emergency guardians for CG pending a hearing on their motion. Both DG and BCC objected to Beth and Nicholas's petition. At a hearing on December 6, the trial court stated that it did not see the need for an emergency guardianship because CG and BCC were in a stable environment while living with Beth and Nicholas in LaCenter. On January 25, 2023, the trial court entered an order appointing a guardian ad litem (GAL) for CG.

Meanwhile, on December 12, 2022, DG filed a petition for custody of CG in Marion County, Oregon. The Oregon court held hearings and appointed a guardian ad litem. BCC was served with the petition, but she did not file a response or appear in the matter. Apparently, the Oregon court entered a default order against BCC.[2]

*UCCJEA Proceedings*

In February 2023, Beth and Nicholas filed a motion for a UCCJEA conference and for entry of an order determining that the Washington court had jurisdiction over CG. DG opposed the motion, arguing that CG had lived in Oregon for a substantial period since her birth.

---

[2] DG claims that the default order was against Beth and Nicholas. But the Oregon caption shows that only BCC was a party, and the Oregon court stated that DG sought default against "the respondent," who was BCC.

The motion stated that CG was born in Washington, and had lived with Beth and Nicholas in Washington since the end of July 2022. The motion also stated that CG's health insurance and doctors were in Washington.

DG argued that BCC and CG lived in Oregon for five months before the couple separated, when CG was five and a half months old. DG also argued that Washington lacked jurisdiction over the custody of CG because CG had lived in Washington for only four months when Beth and Nicholas filed their petition for guardianship, rather than six months as required by the UCCJEA.

In March 2023, the Washington trial court held a UCCJEA conference with the Oregon court. The Oregon court noted that DG filed his petition for custody of CG in Oregon after he was served with Beth and Nicholas's petition for minor guardianship that they filed in Washington. The Oregon court also noted that it entered a default order before it learned about the Washington case. The Oregon court stated, "[T]here's not a good basis for Oregon to have home state jurisdiction under the UCCJEA based on what's in front of me." Rep. of Proc. (RP) at 52-53.

The Washington trial court stated, "The child is here in Washington, has been. This [guardianship case] predates the Oregon case. . . . And so, if the State of Oregon is not asking this Court to do so, I think we'd like to just proceed here in Washington." RP at 53. Both courts agreed that Washington would exercise jurisdiction over the dispute. The Washington court entered an order stating that Washington would exercise jurisdiction over the case. The Oregon court entered an order declining to exercise jurisdiction and vacating its previous default order.

DG filed a motion for discretionary review in this court regarding the trial court's jurisdiction order. A commissioner of this court denied DG's motion and held that there was no obvious or probable error that warranted discretionary review.

On May 4, 2023, BCC and CG moved back in with DG in Oregon. On May 5, Beth and Nicholas filed another motion for an emergency minor guardianship for CG. The motion was based on the allegation that CG had suffered three significant injuries at Beth and Nicholas's home because of BCC's negligence. The trial court appointed Beth and Nicholas as emergency guardians for CG pending a hearing on their motion.

After a hearing, the trial court approved the emergency guardianship. In July, the court again extended the emergency guardianship.[3] The trial on Beth and Nicholas's guardianship petition was scheduled for August 2023.

*Trial Testimony*

At trial, Beth testified that when she first met DG in December 2020, he was both drunk and high. Beth testified that in 2021, she learned that DG had set up cameras in BCC's condominium and was recording all of BCC's conversations. Beth learned that when using methamphetamine, DG would search for child pornography. After Beth confronted him, DG said "at least it's nothing physical" regarding the alleged pornography. RP at 169. Beth testified that DG had used methamphetamine as recently as August 2022. She also testified that BCC moved back in with Beth and Nicholas in July 2022 because of "domestic violence" and an incident during which DG had kicked down the door to his and BCC's master bedroom. RP at 181.

---

[3] DG serially filed notices of discretionary review in the trial court every time the court extended its order granting Beth and Nicholas's guardianship of CG pending trial. DG also sought discretionary review through numerous motions in the Supreme Court. The Supreme Court denied all of DG's motions.

Beth also testified as to the living conditions in DG's house as "flies everywhere, dishes in the sink" and "really dirty and gross." RP at 182. She stated that BCC and DG did not have trash service due to unpaid bills and almost had a car repossessed. When she helped BCC move out of DG's house, she stated that the water and garbage service were shut off and there was a large pot of water in the living room. DG went to the bathroom in the backyard.

Beth also observed fights between DG and BCC. In September 2022, Beth saw DG and BCC fighting. Beth also testified that she saw DG and BCC push car doors into one another.

Beth testified that in May 2022 when CG was three months old, BCC left CG home with DG while she went to the store. BCC was gone for about 45 minutes. CG cried the entire time to the point of vomiting on herself.

Beth took CG to the doctor for CG's two-month-old checkup (at the age of three months) and realized the DG had not added CG as a beneficiary on his health insurance. Beth and Nicholas paid for CG's doctor visit.

Beth testified that DG did not participate in his supervised visits with CG. She stated that she believed that this was because he did not complete his drug tests as required by the emergency guardianship order. Beth and Nicholas offered video calls with CG to DG, but DG refused. Beth testified that DG has not provided any financial support for CG.

Nicholas testified that he visited DG's house when he helped move BCC out of that house. He testified that DG's house smelled of "rotting" and was dirty and cluttered. RP at 283. The home had no running water and there were many bugs flying around leftover food. Nicholas testified that DG's home was "very pungent." RP at 283.

Nicholas testified that he learned from BCC that DG had relapsed and used methamphetamine in August 2022. He also stated that he pays for CG's daycare and babysitting arrangements while he and Beth are at work.

Sherri Farr was the court appointed GAL who conducted an investigation and prepared three reports for the guardianship proceedings. Farr interviewed Beth and Nicholas, DG, and BCC for her first two reports. Farr stated that neither DG nor BCC participated in Farr's investigation for her third report. Farr recommended that Beth and Nicholas be appointed as guardians of CG. Farr testified that DG has "ups and downs," "out-of-control behavior," and "outbursts." RP at 368. She also reported that BCC was concerned about leaving CG alone with DG while bathing or changing. Farr testified that DG told her he was using drugs up until November 2022.

DG also testified. He stated that he worked as a repairman for recreational vehicles until a hand injury prevented him from working. He admitted that he was convicted of possession of pornography of minors in December 2011 and that he never completed sex offender treatment classes. DG claimed that he had no substance abuse issues after CG was born. DG testified that he had used drugs since BCC and CG moved in with Beth and Nicholas but was in a drug abuse recovery class. He also completed parenting classes. DG stated that he took care of CG and attended to her daily needs. But he acknowledged that he had not helped Beth and Nicholas with CG's expenses. DG also testified that during the incident in which CG cried for 45 minutes while BCC went to the store, he unintentionally fell asleep because of a long work day.

On cross-examination, DG testified that he used methamphetamine from July 2022 to March 2023. He also testified that he had an active arrest warrant in Arizona. DG admitted that

during a fight with BCC, he kicked a door down to a room CG and BCC were in because "I didn't wanna wait, so I went in." RP at 565. He stated that he had not seen CG since May 2023.

BCC testified that one day she had gone to the store to pick up formula. She was gone for about 45 minutes and left CG with DG. BCC testified, "[CG] had been crying when I got home, and I picked her up immediately. And I had gone to find where [DG] was, and he had fallen asleep on the bed in the master bedroom." RP at 629.

BCC also testified that one night she was putting CG to bed and had locked the bedroom door behind her. DG came to the room and asked for the door to be unlocked. When BCC did not do so because she was putting CG to bed, he kicked in the door and then lay down in the bed and went to sleep.

The trial court entered an order granting Beth and Nicholas guardianship of CG until she is 18. The court ruled that it had jurisdiction over CG. The court found,

> [CG] lived in Washington with a parent or someone acting as a parent for at least the 6 months just before this case was filed, or if the child is less than 6 months old when the case was filed, they had lived in Washington with a parent or someone acting as a parent since birth. Moreover, the court held a UCCJEA conference and found that Oregon declined to exercise jurisdiction.

Clerk's Papers (CP) at 632.

Regarding the guardianship, the court found that "[i]t is in [CG's] best interest to appoint a guardian" and DG and BCC were "**not** willing or able to provide for the support, care, education, health, safety, and welfare of a child under age 18 (exercise the parenting functions in RCW 26.09.004)." CP at 633. The court made several specific findings of fact, including: (1) there was "no parent willing or able to exercise parenting functions," (2) DG and BCC had "not maintained a stable and consistent relationship with [CG],"(3) "[n]either parent has exercised appropriate judgment while caring for the child," (4) DG had not "provided for the daily needs of

8

[CG]," (5) DG had not "addressed his drug use," or "visited [CG] since the emergency guardianship went into effect," (6) CG was exposed to domestic violence when DG kicked down the door and that his explanation of the incident "makes no sense," and (7) "[i]t is in [CG's] best interest to appoint a guardian." CP at 633.

*Appeal and Subsequent Developments*

DG appealed the trial court's guardianship order. Two weeks later, a notice of appeal was filed on behalf of BCC. However, her name was typed rather than handwritten on the signature line. On March 21, 2024, a certificate of service was filed stating that BCC's notice of appeal had been served. Again, BCC's name was typed rather than signed. Also on March 21, a motion and declaration to waive the appellate court filing fee was filed, purportedly by BCC. BCC's name was signed in two places.

On March 22, Beth and Nicholas filed a "Motion for Sanctions for Forging and Submitting Forged Pleadings." Mot. for Sanctions for Forging and Submitting Forged Pleadings (Mar. 22, 2024). The motion alleged that DG had forged BCC's name on pleadings. Attached to the motion was a sworn declaration from BCC, which stated,

> The signature to a document in this appeal ostensibly executed by me on March 21, 2024, is a forgery. I did not sign it. I believe [DG] did. I do not desire to bring any motion in this court. I do not desire to be involved in any aspect of [DG]'s appeal in the cause number to which my referenced forged "signature" is appended. All my "signatures" under this cause number are forgeries and are not reflective of anything I desire in this appeal brought solely by [DG].

Mot. for Sanctions for Forging and Submitting Forged Pleadings at 5 (Mar. 22, 2024). BCC's signature on the declaration was significantly different than the signature on the March 21 motion and declaration.

A commissioner of this court continued the issue of sanctions until the court received a communication directly from BCC regarding whether she wanted to dismiss her appeal. BCC subsequently filed the following pleading:

> I, [BCC], am voluntarily requesting that the appeal filed under my name be dismissed. The signature to a document in this appeal (Court of Appeals No. 59281-9-II) (Clark County Cause No. 22-4-01478-06) supposedly filed by me on March 21, 2024, is a forgery. I didn't sign it. [DG] filed this document "on my behalf", I hadn't even seen it until it was filed. I do not wish to be apart of [DG's] appeal in any way.

Mot. For Voluntary Dismissal (Apr. 15, 2024). Accordingly, this court dismissed BCC's appeal. The court did not address the request for sanctions against DG.

## ANALYSIS

### A.    MOTION TO DISMISS APPEAL

Initially, in their briefing to this court, Beth and Nicholas include a motion to dismiss DG's appeal based on the allegation that DG forged BCC's signature on appeal pleadings. We decline to dismiss DG's appeal.

RAP 17.4(d) states, "A party may include in a brief only a motion which, if granted, would preclude hearing the case on the merits." Because granting Beth and Nicholas's motion would preclude addressing the merits of DG's appeal, the motion is properly made.

DG's apparent forgery of BCC's signature was highly improper. However, BCC's appeal was dismissed, and the alleged forgery has no effect on DG's appeal. And the court commissioner did not address Beth and Nicholas's request to impose sanctions on DG. Under these circumstances, we decline to dismiss DG's appeal.

### B.    JURISDICTION

DG argues that Oregon rather than Washington had exclusive jurisdiction over CG. We disagree.

10

1. Legal Principles

The UCCJEA is a set of uniform laws adopted by many states to resolve conflicts related to interstate child custody disputes. *In re Custody of A.C.*, 165 Wn.2d 568, 574, 200 P.3d 689 (2009). Washington's UCCJEA is codified act chapter 26.27 RCW. The UCCJEA is the "exclusive jurisdictional basis for making a child custody determination by a court of this state." RCW 26.27.201(2).

RCW 26.27.201(1) states,

Except as otherwise provided . . . a court of this state has jurisdiction to make an initial child custody determination only if:

(a) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(b) A court of another state does not have jurisdiction under (a) of this subsection, or *a court of the home state of the child has declined to exercise jurisdiction* on the ground that this state is the more appropriate forum under RCW 26.27.261 or 26.27.271, and:

   (i) *The child and the child's parents*, or the child and at least one parent or a person acting as a parent, *have a significant connection with this state* other than mere physical presence; and

   (ii) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(c) *All courts having jurisdiction under (a) of this subsection have declined to exercise jurisdiction* on the ground that a court of this state is the more appropriate forum to determine the custody of the child under RCW 26.27.261 or RCW 26.27.271; or

(d) No court of any other state would have jurisdiction under the criteria specified in (a), (b), or (c) of this subsection.

(Emphasis added.)

RCW 26.27.021(7) states,

"Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with a parent or person acting as a parent. A period of temporary absence of a child, parent, or person acting as a parent is part of the period.

Whether a trial court has the authority to exercise its jurisdiction under the UCCJEA is a mixed question of law and fact. *In re Marriage of McDermott*, 175 Wn. App. 467, 483, 307 P.3d 717 (2013). We treat the trial court's unchallenged findings of fact as true on appeal and review its conclusions of law de novo. *Id.*

2.    Effect of Commissioner's Ruling

Beth and Nicholas argue that DG is bound by the ruling of a commissioner of this court denying DG's motion for discretionary review on the jurisdiction issue. We disagree.

RAP 2.3(b) determines whether discretionary review is warranted. Relevant here, this court can grant discretionary review only if the trial court committed probable or obvious error. RAP 2.3(b)(1)-(2). Here, the commissioner denied discretionary review because there was no probable or obvious error.

However, the commissioner did not make a final decision on the merits of DG's jurisdiction argument. Instead, the commissioner merely denied discretionary review under RAP 2.3(b). RAP 2.3(c) states, "[T]he denial of discretionary review of a superior court decision does not affect the right of a party to obtain later review of the trial court decision or the issues pertaining to that decision." Therefore, a commissioner's discretionary review ruling does not create the law of the case and has no binding effect on a subsequent appeal. *See Gull Indus., Inc. v. Granite State Ins. Co.*, 18 Wn. App. 2d 842, 854 n.8, 493 P.3d 1183 (2021).

3. Consideration of UCCJEA Factors

DG argues that the Oregon court failed to consider all of the facts during the UCCJEA conference before it declined jurisdiction. We disagree.

DG argues that the only evidence before the Oregon court was a letter from Beth and Nicholas's attorney, and the court did not consider DG's argument. But DG appeared at the hearing and his attorney submitted evidence as to why Oregon should retain jurisdiction. There is no indication that the Oregon court did not consider DG's evidence and arguments. Therefore, we reject DG's argument.

DG also argues that the Oregon court's decision to decline jurisdiction was made extremely quickly, and the court did not explain why Washington would be the better forum. But the record shows that the Oregon court made its decision based on the evidence before the court, including the fact that the Washington proceeding predated the Oregon proceeding. Moreover, we note that the record does not show any attempt by DG to clarify or seek reconsideration of the Oregon court's decision to decline jurisdiction in Oregon court. We reject DG's argument.

4. Jurisdiction under UCCJEA

DG argues that the trial court erred in determining Washington was CG's home state under the UCCJEA because CG was only temporarily absent from Oregon when she went to Washington. We disagree.

Here, CG was in Washington for only four months when Beth and Nicholas filed their petition for guardianship. CG was born on February 11, 2022. CG lived in Oregon from February 28 to July 31, when CG and BCC moved back to Washington with Beth and Nicholas. And Beth and Nicholas filed their initial petition for guardianship in November. Therefore,

Washington was not CG's home state "within six months before the commencement of the proceeding." RCW 26.27.201(1)(a).

But the Oregon court declined to exercise jurisdiction because it believed Washington was the more appropriate forum. Therefore, we must analyze whether Washington could properly exercise its jurisdiction under RCW 26.27.201(1)(b), which addresses whether:

> (i) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

> (ii) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

BCC and CG have a "significant connection" to Washington. RCW 26.27.201(1)(b)(i). BCC and CG lived in Washington with Beth and Nicholas for an extended period – over seven months at the time of the UCCJEA hearing. During that time, Beth and Nicholas cared for CG and performed various daily tasks for her. This was more than mere physical presence.

In addition, there was substantial evidence of CG's care, protection, training, and personal relationships in Washington. CG lived with BCC and Beth and Nicholas in Washington, and CG had a personal relationship with them. BCC and Beth and Nicholas cared for CG in Washington, and CG had a doctor in Washington. Therefore, even if Washington was not CG's "home state" under RCW 26.27.201(1)(a), the trial court did not err in exercising its jurisdiction under RCW 26.27.201(1)(b).

DG argues that Oregon had exclusive original jurisdiction due to the investigation by Oregon Child Protective Services. But even if Oregon first exercised jurisdiction, the Oregon court subsequently declined to exercise its jurisdiction at the UCCJEA conference. And we have no authority review the Oregon court's choice to decline jurisdiction.

Accordingly, we hold that the trial court did not err in exercising its jurisdiction over the guardianship proceeding.

C.     GUARDIANSHIP ORDER

DG argues that the trial court erred by granting Beth and Nicholas's petition for a guardianship of CG.  We disagree.

1.     Legal Principles

RCW 11.130.190(1) states, "A person interested in the welfare of a minor, including the minor, may petition for appointment of a guardian for the minor."  Under RCW 11.130.185(2), a trial court

> may appoint a guardian for a minor who does not have a guardian if the court finds the appointment is in the minor's best interest and:
> . . . .
>
> (c) There is clear and convincing evidence that no parent of the minor is willing or able to exercise parenting functions as defined in RCW 26.09.004.

The trial court applied subsection (c) here.

Under RCW 26.09.004(2)(a)-(f), parenting functions include "[m]aintaining a loving, stable, consistent, and nurturing relationship with the child"; attending to the child's daily needs "such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child"; providing adequate education; assisting the child in developing relationships; "[e]xercising appropriate judgment regarding the child's welfare"; and financially supporting the child.

We review the trial court's grant of a petition for guardianship for an abuse of discretion. *In re Guardianship of F.S.*, 33 Wn. App. 2d 24, 35, 559 P.3d 138 (2024), *review denied*, 4 Wn.3d 1015, 564 P.3d 562 (2025).  "Determining who should be appointed as a child's guardian is a fact-intensive inquiry that trial courts are necessarily in a better position than the appellate courts

to decide." *In re Guardianship of L.C.*, 28 Wn. App. 2d 766, 772, 538 P.3d 309 (2023). A trial court abuses its discretion when it "(1) adopts a view that no reasonable person would take and is thus manifestly unreasonable, (2) rests on facts unsupported in the record and is thus based on untenable grounds, or (3) was reached by applying the wrong legal standard and is thus made for untenable reasons." *Id.* (internal quotations and citations omitted).

We review the trial court's factual findings for substantial evidence. *F.S.*, 33 Wn. App. 2d at 35. " 'Substantial evidence is evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.' " *Id.* (quoting *In re Guardianship of Cornelius*, 181 Wn. App. 513, 536, 326 P.3d 718 (2014)). We do not decide the credibility of witnesses or weigh the evidence. *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

RCW 11.130.185(2)(c) requires clear and convincing evidence that "no parent of the minor is willing or able to exercise parenting functions." Under the clear and convincing evidence standard, substantial evidence exists when the fact is "shown by the evidence to be highly probable." *In re Dependency of A.N.C.*, 24 Wn. App. 2d 408, 414, 520 P.3d 500 (2022) (internal quotation marks omitted).

2. Challenged Findings of Fact

DG argues that several of the trial court's findings of fact are not supported by substantial evidence. We disagree.[4]

a. Parenting Functions Finding

DG challenges the trial court's findings of fact that state, "There is no parent willing or able to exercise parenting functions," "[DG] ha[s] not maintained a stable and consistent

---

[4] Because BCC does not appeal, we only address these findings with regard to DG.

16

relationship with the child," DG has not "visited the child since the emergency guardianship went into effect," and DG has not "provided for the daily needs of [CG]." CP at 633.

The evidence shows that DG is not willing or able to exercise parenting functions and that he regularly used methamphetamine during CG's life. Testimony also showed that DG has failed to pay his bills, had his water shut off, and lived in conditions that a fair-minded person could find was not suitable parenting. Similarly, there was some evidence showing that when DG uses methamphetamine, he searches for child pornography. This was enough of a concern that BCC exercised caution with CG when DG would bathe CG or change her diaper. These behaviors are not proper parenting functions. We conclude that substantial evidence supports the trial court's finding that there is no parent willing or able to exercise parenting functions.

We also conclude that substantial evidence supports the trial court's other challenged findings. It was undisputed that DG had not visited CG since she was placed with Beth and Nicholas through the emergency minor guardianship, and he admitted that he had not helped Beth and Nicholas with CG's expenses. Therefore, a fair minded person also could find that DG has not maintained a stable or consistent relationship with CG.

b. Parental Judgment Finding

DG challenges the trial court's finding of fact that states, "[n]either parent has exercised appropriate judgment while caring for the child." CP at 633. Because BCC does not appeal, we only address this finding with regard to DG.

Testimony at trial showed that DG failed to exercise appropriate parental judgment in the few moments he solely was responsible for CG. During the time BCC went to the store for formula, DG fell asleep and allowed CG to cry for 45 minutes. A fair minded person could determine that this was not appropriate parental judgment. In addition, DG did not provide a

sanitary home for CG, and there is evidence that he spent funds to support his methamphetamine use rather than paying for utilities or garbage service. And DG failed to add CG to his health insurance coverage. Therefore, we conclude that substantial evidence supports the trial court's finding.

c.    DG's Drug Use Finding

DG challenges the trial court's finding of fact that states DG "has not addressed his drug use." CP at 633.

DG testified that he still smokes marijuana and had used methamphetamine during CG's life. He admitted that he used methamphetamine from July 2022 to March 2023. Although DG completed required drug classes as a result of his previous criminal convictions, DG testified that he does not attend regular meetings or continue education regarding drug use. And DG refused to submit comprehensive drug testing as part of the emergency guardianship process. Therefore, a fair-minded person could find that DG had not addressed his drug use. We conclude that substantial evidence supports the trial court's finding.

d.    Domestic Violence Finding

DG challenges the trial court's finding of fact that states, "The testimony regarding [DG] kicking down the door makes no sense and is an act of domestic violence to which the child was exposed." CP at 633.

The veracity of this incident turns on the credibility of witnesses, which we do not review. *A.W.*, 82 Wn.2d at 711. BCC, Beth, and DG all provided testimony about the incident. DG testified that he just wanted to enter the room, which led him to kick down the door. But Beth's testimony was that this incident was a fight. The trial court weighed the credibility of the

witnesses and determined that DG's account of the incident made little sense. We do not review a trial court's credibility determinations. *A.W.*, 182 Wn.2d at 711.

In addition, substantial evidence supports that this was an act of domestic violence. DG kicked down a door in what appears to be a fit of anger. His child and girlfriend were behind the door. A fair minded person could believe that this was an act of domestic violence. Therefore, we conclude that substantial evidence supports the trial court's finding.

DG argues that this was a single incident that does not show an extensive history of domestic violence or an inability to parent. But the trial court's finding does not say that there is an extensive history of domestic violence or that the incident showed an inability to parent.

   e.   DG's Relationship with CG

DG claims that the trial court made a finding that "D.G. has not maintained a relationship with C.G. during the pendency of the May 5, 2023 emergency order." Br. of Appellant at 40. However, the court made no such finding. As discussed above, the court did make a finding that "[DG] ha[s] not maintained a stable and consistent relationship with the child." CP at 633. We conclude above that substantial evidence supports this finding.

   f.   Lack of Expert Testimony

DG argues that the trial court's findings of fact are not supported by substantial evidence because there was no expert testimony about any actual harm to CG. But there is no requirement that an expert provide such testimony. And DG does not provide any meaningful argument about how any expert testimony would impact the trial court's findings of fact. Expert testimony is not required for a trial court to determine whether or not a parent is unable to take care of a child or if a child has suffered actual detriment. We reject DG's argument.

3.    Approval of Guardianship

DG argues that the trial court erred when it approved Beth and Nicholas's guardianship petition.  We disagree.

Under RCW 11.130.185(2)(c), the trial court may appoint a guardian for a minor (1) "if the court finds the appointment is in the minor's best interest" and (2) "[t]here is clear and convincing evidence that no parent of the minor is willing or able to exercise parenting functions as defined in RCW 26.09.004."

As discussed above, substantial evidence supports the trial court's multiple findings regarding DG's parenting.  These findings reflect clear and convincing evidence that DG is not willing or able to exercise parenting functions.  And these findings support the court's conclusion that a guardianship is in CG's best interest.

DG emphasizes that he has a constitutional right to parent.  Therefore, he argues that to obtain a guardianship Beth and Nicholas must show that he is an unfit parent or that placing CG with him would result in "actual detriment to the child's growth and development." *In re Custody of L.M.S.*, 187 Wn.2d 567, 571, 387 P.3d 707 (2017).  He argues that Beth and Nicholas did not present evidence of actual detriment to CG for the court to order a guardianship, citing *In re Custody of A.L.D.*, 191 Wn. App. 474, 363 P.3d 604 (2015).

But *L.M.S.* and *A.L.D.* both involved a prior version of the nonparental guardianship statute, former RCW 26.10.032(1) (2003).  The old statute required only a declaration that the child was not in the physical custody of either parent and evidence demonstrating "that neither parent is a suitable custodian."  Former RCW 26.10.032(1).  *L.M.S.* held that to pass constitutional muster, in addition to meeting the prior statute's standard the petitioner was required to show an unfit parent or detriment to the child.  187 Wn.2d at 576.

The current nonparental guardianship statute requires a showing that the guardianship is in the child's best interest *and* that clear and convincing evidence demonstrates no parent is willing or able to exercise the list of parenting functions listed in RCW 26.09.004(2). We conclude that if a trial court makes the required findings under RCW 11.130.185(2)(c), those findings will meet the constitutional threshold to avoid a violation of the constitutional right to parent.

Accordingly, we hold that the trial court did not err when it granted guardianship of CG to Beth and Nicholas.

D.      ATTORNEY FEES ON APPEAL

Beth and Nicholas request attorney fees on appeal under RAP 18.1(a). RAP 18.1(a) permits reasonable attorney fees if granted under applicable law. RCW 26.27.511, part of the guardianship statute, states, "The court shall award the prevailing party . . . necessary and reasonable expenses incurred by or on behalf of the party, including . . . attorneys' fees . . ., unless the party from whom fees or expenses are sought establishes that the award would be clearly inappropriate."

Beth and Nicholas are the prevailing party in this guardianship action. DG has not shown that an attorney fee award would be clearly inappropriate. Therefore, we award Beth and Nicholas their reasonable attorney fees on appeal.

Beth and Nicholas also ask us to grant the "fullest equitable relief it feels is merited to restrain [DG] from submitting further appellate litigation." Br. of Resp't at 24. But they do not identify what form of equitable relief we should grant. We therefore decline to award equitable relief at this time.

CONCLUSION

We affirm the trial court's grant of minor guardianship of CG to Beth and Nicholas C.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is

so ordered.

MAXA, P.J.

We concur:

LEE, J.

CHE, J.